[Crim. No. 2871.   Fourth Dist., Div. One.   Dec. 21, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. LEE B. HAMILTON et al., Defendants and Appellants.

David Randall Sherer, under appointment by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Ronald M. George, Deputy Attorney General, for Plaintiff and Respondent.

WHELAN, J.—Defendants, who are husband and wife, were found guilty in a jury trial of possession of marijuana. They appeal from orders granting probation and from an order denying their motion for a new trial. The appeal from the order denying such motion is non-appealable, and has been dismissed.

The grounds of appeal from the conviction are insufficiency of the evidence and that marijuana, received in evidence over defendants' objection, was the product of an illegal seizure following an illegal entry into the house in which defendants were arrested and the marijuana was found.

We are of opinion that the latter contention is well taken and that the reception of such evidence as to these defendants compels reversal.

## FACTS

The following matters were developed on *voir dire* out of the presence of the jury:

At 5 a.m. on August 11, 1966, Deputy Sheriff Franklin, with six to eight other officers, went to a residence at 7713 Eads in San Diego to serve arrest warrants on three persons whom he expected to find there: Warren Hughey, Carl Vincent Stromberg and Paul Spackman, Jr., none of whom was known to be armed. The action was part of a citywide effort to make arrests at coordinated times, the arrest having been

deferred so as to make them en masse. The warrants had been issued upon indictments of the San Diego County grand jury. Defendants were not among those indicted; were not being sought by the police, who had no prior knowledge that defendants were in the house.

Franklin, who had a rough floor plan of the house, approached the front door from the street with some of the officers, others of whom had gone to the rear. The house was quiet and dark. Franklin turned on his flashlight so as to be able to make his way onto the porch and toward the front door; turned the knob of the door, which he found to be unlocked; pushed the door open; shined his flashlight into the living room before entering.

The police had known for some days that there would be arrests at that time and that there would have been time to get a search warrant if one had been desired. The grand jury indictments were returned upon evidence that certain named individuals had sold marijuana at the house. The physical evidence to support the indictments had already been collected and was in custody; Franklin did not desire further evidence for those prior offenses.

Franklin knew from his investigation, and from other information, that narcotics had also been used on the premises. Another deputy sheriff had observed narcotics being used on the premises and had purchased narcotics there, which on four occasions had been turned over to Franklin, including four pounds of marijuana on one occasion within a month before August 11. The deputy had told Franklin that after that purchase there appeared to remain at least 8 to 10 kilos of marijuana inside a large shopping bag in the living room.

Franklin felt on August 11, 1966, that there might be a large quantity of marijuana on the premises because of the number of people who had been reported as going there and conducting business there, both during the daytime and the nighttime, including several who had been charged in the indictment or were known to be associated with persons who were charged, all known to have used, purchased, or sold narcotics on the premises.

From his experience as a narcotics officer, Franklin knew that it was not uncommon for users and sellers of narcotics to attempt to destroy evidence by eating it or flushing it down a toilet; because of the people he believed were on the premises, he ''felt strongly'' that narcotics might be destroyed if he

were to knock on the door; he expected to find narcotics in ounce quantities, which quantities can be destroyed easily.

After the court had ruled admissible against defendants the evidence obtained by the police in the house, testimony was resumed in open court.

Defendants were lying on the floor of the living room; near them was an ashtray containing two partially smoked marijuana cigarettes and a small brass pipe. Also lying on the floor was their 15-month-old child. A male individual, Brittain, was lying on the davenport, and at his feet was a large dog. In a chair in a corner was another man, Weldon. Everyone appeared to be asleep. Defendant Lee B. Hamilton was wholly unclothed except for the blanket wrapped about him.

In one bedroom Warren Hughey was on the bed; on the bed in a second bedroom was Paul Spackman, Jr., both of whom were placed under arrest pursuant to two of the arrest warrants. Officer Odom of the San Diego police had entered the unlocked back door and found one Baker on a bed in a third bedroom. Marijuana was found in three rooms: in the living room, on a table, near the couch, on the floor, and in a briefcase behind a couch pillow; in one bedroom it was found in the closet and bed; and it was found in the kitchen wastebasket.

### CLAIMED ILLEGAL ENTRY

*Was the entry by the Sheriff's Deputy and the police a legal entry as to these defendants?*

No.

### THE MEANING AND EFFECT OF SECTION 844, PENAL CODE

■ Section 844, Penal Code, defines the conditions under which an officer in making a lawful arrest "may break open the door or window of the house in which the person to be arrested is" or is reasonably believed to be. The expressed condition is that the officer first demand entrance and explain the purpose for which admittance is desired.

The section is a codification of the common law on the subject, and leaves the law of arrests where the common law left it.

Similar statutes are section 1531, Penal Code, and section 3109 of Title 18, U.S.C.A., both dealing with the execution of search warrants. Section 3109 of Title 18, U.S.C.A. has been interpreted as embodying the pre-existing common law on that subject. (*Leahy* v. *United States* (9th Cir. 1959) 272 F.2d 487.)

There was a common law privilege of an officer to make forcible entry in order to serve a warrant, which extends to an officer who has probable cause to believe a felony has been or is being committed, if a person guilty thereof is believed reasonably to be within the premises entered. The privilege is defined in Restatement of Torts, sections 204-206: "b. . . . [The privilege] includes the breaking or destruction of any portion of the outer part of a building . . . or the change in location of any such part, such as the moving or pushing aside of any object placed there as a barrier. [P. 512.]

". . . .

"d. . . . [I]t is usually a prerequisite to the privilege . . . that the actor shall first explain his errand and make demand upon the possessor to permit him to enter and make the arrest . . . Upon refusal of such demand, or if no refusal be made by word or act, upon the expiration of a reasonable time, the privilege to effectuate a forcible entry arises. Such reasonable time would ordinarily be very brief.

"If for any reason an explanation of his errand and demand for admittance by the actor are or reasonably appear to him to be impracticable, as where such explanation and demand would tend to frustrate or to make much more dangerous to life or limb the arrest or other apprehension, the above requirements may be dispensed with. . . . [P. 513.]

"b. The word 'break' is . . . used in the same sense in which it is used in defining the crime of burglary. . . ." [P. 512.]

Within the common law definition of burglary, "[t]he pushing open of a door entirely closed, but unlocked, is . . . a sufficient breaking to sustain a conviction for breaking and entering or for burglary," (*Winchester* v. *Becker*, 4 Cal.App. 382, 384 [88 P. 296]; 13 Am.Jur.2d § 15, p. 330; *Cooper* v. *State*, 83 Fla. 34 [90 So. 693, 23 A.L.R. 109]; *Kent* v. *State*, 84 Ga. 438 [11 S.E. 355, 20 Am.St.Rep. 376]; *Commonwealth* v. *Mackey*, 171 Ky. 473 [188 S.W. 676]; *State* v. *Henderson*, 212 Mo. 208 [110 S.W. 1078, 15 Ann. Cas. 930, 17 L.R.A. N.S. 1100]; *State* v. *Vierck*, 23 S.D. 166 [120 N.W. 1098, 139 Am. St. Rep. 1040]; *State* v. *Lapoint*, 87 Vt. 115 [88 A. 523, Ann. Cas. 1916C 318, 47 L.R.A. N.S. 717]), as is the opening of an unlocked screen door (*United States* v. *Poppitt*, 227 F.Supp. 73, 80). (See *Arrest Without a Warrant* by Wilgus, 22 Mich. L.R. 806.)

302

■ If a door is found open by the officer (*United States* v. *Williams,* 351 F.2d 475) or opened to him, although not by the defendant who is intended to be placed under arrest, the officer may enter without warning (*People* v. *Chacon,* 223 Cal. App.2d 739 [35 Cal.Rptr. 799]; *People* v. *Baranko,* 201 Cal. App.2d 189 [20 Cal.Rptr. 139]; *Hopper* v. *United States,* 267 F.2d 904), or if the door is opened by the defendant as the result of a ruse, unaccompanied by any exercise of force by the peace officer (*People* v. *Lawrence,* 149 Cal.App.2d 435, 444 [308 P.2d 821]; *People* v. *Scott,* 170 Cal.App.2d 446, 452 [339 P.2d 162]; *Dickey* v. *United States* (9th Cir. 1964) 332 F.2d 773; *Leahy* v. *United States, supra* (9th Cir. 1959) 272 F.2d 487; *Rex* v. *Backhouse,* 98 Eng.Rep. 533).

A few cases have sought to distinguish between a locked and an unlocked door, in terms of the officer's duty to make an announcement before entering. (*Keiningham* v. *United States,* 287 F.2d 126, 130 [109 App.D.C. 272] [decision 2-1; Circuit Court D. C.].)

The distinction is made in *People* v. *Feeley,* 179 Cal.App.2d 100, 105 [3 Cal.Rptr. 529], which cannot be considered as authority since none of the narcotics uncovered as a result of the entry and search was offered in evidence.

■ To use a key to open a locked door without permission of the defendant is a forcible entry (*People* v. *Arellano,* 239 Cal.App.2d 389 [48 Cal.Rptr. 686]; *Munoz* v. *United States,* 325 F.2d 23, 26; *Winchester* v. *Becker, supra,* 4 Cal. App. 382, 384), and its legality, if the entry is not made in conformity with section 844, depends upon whether compliance is excused by the circumstances of the particular case. (*Ker* v. *California,* 374 U.S. 23 [10 L.Ed.2d 726, 83 S.Ct. 1623] ([*People* v. *Ker*] 195 Cal.App.2d 246 [15 Cal.Rptr. 767]); *People* v. *Gilbert,* 63 Cal.2d 690, 707 [47 Cal.Rptr. 909, 408 P.2d 365].)

The test to be applied is the same as though a locked door were broken through without making the announcements called for by section 844.

That, too, is the test to be applied where the entrance is gained by opening an unlocked door, and which was applied in *People* v. *Holloway,* 230 Cal.App.2d 834 [41 Cal.Rptr. 325].

Viewed in the light of these rules, the entry was illegal as to the two defendants parties to this appeal and evidence obtained against them as the result of such entry should not have been admitted.

■ Compliance with section 844 is excused: ". . . if the facts known to the officer before his entry were sufficient to support his good faith belief that compliance would have increased his peril or frustrated the arrest. Later cases have included the prevention of destruction of evidence as an additional ground for noncompliance. . . ." (*People* v. *Gastelo,* 67 Cal.2d 586, 587 [63 Cal.Rptr. 10, 432 P.2d 706].) Gastelo states: "Neither this court nor the United States Supreme Court has held that unannounced forcible entries may be authorized by a blanket rule based on the type of crime or evidence involved." (P. 598)

*Gastelo* discusses the fact situations that were held to excuse noncompliance in *People* v. *Carrillo,* 64 Cal.2d 387 [50 Cal.Rptr. 185, 412 P.2d 377]; *People* v. *Smith,* 63 Cal.2d 779 [48 Cal.Rptr. 382, 409 P.2d 222]; *People* v. *Gilbert, supra,* 63 Cal.2d 690; *People* v. *Hammond,* 54 Cal.2d 846 [9 Cal.Rptr. 233, 357 P.2d 289].

In other cases compliance has been excused where an officer without a warrant had probable cause to believe, based upon sales of narcotics made immediately or at most a few hours before the entry, that the defendant had narcotics in his possession (*People* v. *Montano,* 184 Cal.App.2d 199 [7 Cal.Rptr. 307]; *People* v. *Bookout,* 197 Cal.App.2d 457 [17 Cal.Rptr. 213]; *People* v. *Gauthier,* 205 Cal.App.2d 419 [22 Cal.Rptr. 888]); or where an officer without a warrant perceives orally or visually that a felony is being committed within, the evidence to prove which is of a character to be quickly and easily destroyed (*People* v. *Russell,* 223 Cal.App.2d 733 [36 Cal. Rptr. 27]; *People* v. *Holloway, supra,* 230 Cal.App.2d 834).

Those situations have about them a character of urgency which approximates the circumstances of *Ker* v. *California, supra,* 374 U.S. 23 [10 L.Ed.2d 726, 83 S.Ct. 1623], in which the officers followed defendant to his apartment immediately after they had witnessed what they had probable cause to believe was a delivery of narcotics by defendant.

Conduct by the occupant of the premises intended to be entered that is perceived by the police and reasonably indicates a purpose to delay the entry of the police, either to enable the occupant to conceal or destroy evidence, or to escape, has been held to justify noncompliance with section 844, Penal Code (*People* v. *Villanueva,* 220 Cal.App.2d 443, 448 [33 Cal.Rptr. 811]; *People* v. *Bookout, supra,* 197 Cal. App.2d 457; *People* v. *Carrillo, supra,* 64 Cal.2d 387; *People* v. *Maddox,* 46 Cal.2d 301 [294 P.2d 6]), as has reasonable

cause to believe that a defendant is armed and may use force to resist arrest (*People* v. *Hammond, supra,* 54 Cal.2d 846).

In the case at bench, the officers in force covered both front and rear doors; the evidence had already been secured upon the basis of which indictments had been returned against the three persons named in the warrants of arrest; the house was in darkness and no sounds came from within; a turning of the knob by the officer could indicate that the door was unlocked and that an unimpeded entry was likely after giving the notice and making the demand provided for in section 844, Penal Code, and allowing a reasonable time to pass.[1] The officers did not detect any of the conduct of an affirmative nature described in the cases we have mentioned within the house. They suspected, and with good reason as it turned out, that there was more marijuana on the premises. Yet if the evidence they had obtained which was the basis for the grand jury indictment be put aside, they had no fresh or additional evidence that gave probable cause to believe that the felony of the possession of marijuana was then being committed within the house. That being so, the evidence upon which they relied to justify their entry was that upon which the warrants in their possession were issued, and while the arrest of any of the three persons named in the warrants would have justified a search of the premises, the officers had no reason in seeking to execute the warrants to disregard the provisions of section 844 other than their suspicion that more marijuana would be found in the house, and that contraband could be destroyed.

In the People's brief and in oral argument, the point is made that the officers might have been able to discover by their unannounced entry the positional relationships of the persons within to any contraband that might be discovered; that this tableau vivant might have been dislocated by the movements of those within to get away from close proximity to any contraband if the officers had made their presence known before entering.

The obtaining of such evidence having merely to do with the positions of the occupants under the circumstances here related would not justify noncompliance with section 844, Penal Code.

---

[1] "Approximately 15 seconds" has been held a reasonable time (*United States* v. *Poppitt,* 227 F.Supp. 73), "about a minute" held reasonable (*United States* v. *Whiting,* 311 F.2d 191, cert. denied 372 U.S. 935 [9 L.Ed.2d 766, 83 S.Ct. 882]).

Since the actions of the officers here were part of a coordinated project to arrest indicted defendants in a field of criminal activity in which there may well be extensive intercommunication among those engaged in such criminality, the successful carrying out of the police action might be threatened if opportunity were given for one member of a criminal network to give telephonic warning to others at other locations. If it be assumed that such necessity might sometimes justify noncompliance with section 844, Penal Code, the circumstances known to the police at the time of entry do not suggest the likelihood that those within the house in which defendants were arrested would have had opportunity to give a warning had the police before entering announced their identity and purpose and had they waited a reasonable time.

It is stated in *Ker* v. *California, supra,* 374 U.S. 23, 34 [10 L.Ed.2d 726, 738, 83 S.Ct. 1623, 1630] : ''The States are not . . . precluded from developing workable rules governing arrests, searches and seizures to meet 'the practical demands of effective criminal investigation and law enforcement' in the States, provided that those rules do not violate the constitutional proscription of unreasonable searches and seizures and the concomitant command that evidence so seized is inadmissible against one who has standing to complain.''

It is not without materiality, therefore, that the presence of defendants here was not known to the police and was not known to be connected with any of the transactions upon which the police based their suspicion that marijuana might be in the house.

That, of course, does not mean that if the police had complied with the provisions of section 844, Penal Code, or had had sufficient reason not to comply therewith, defendants might not properly have been caught up in the net.

The convictions and the orders granting probation are reversed.

Brown (Gerald), P. J., and Coughlin, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied April 10, 1968. Burke, J., was of the opinion that the petition should be granted.