[Crim. No. 14573. Second Dist., Div. One. July 8, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. LEO COLEMAN, Defendant and Appellant.

698

Joseph Amato, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Thomas Kallay, Deputy Attorney General, for Plaintiff and Respondent.

LILLIE, J.—Information No. 329891 charged defendant with possession for sale of marijuana on September 20, 1966 (§ 11530.5, Health & Saf. Code) and a prior felony conviction (§ 11500, Health & Saf. Code); information No. 330167 charged him in count I with possession of marijuana (§ 11530, Health & Saf. Code) and in count II with possession of a restricted and dangerous drug in the nature of amphetamine (§ 11910, Health & Saf. Code) on April 15, 1966, and the same prior felony conviction. On the People's motion, the informations were consolidated for trial. The cause was heard by the court sitting without a jury. It found defendant guilty on count I (originally No. 329891) of possession of marijuana, a lesser but necessarily included offense (§ 11530, Health & Saf. Code), and on count II (count I of No. 330167) of possession of marijuana and not guilty on count III of having possession of amphetamine, and the prior felony conviction to be true. A new trial was granted as to count II and the judge found defendant not guilty thereon; the motion for new trial was denied as to count I. Defendant appeals from the judgment.

On September 20, 1966, the desk sergeant told Officer Wanek, Narcotic Division, and his partner Officer Moody that he had received information from a process server, who was looking for defendant for a violation of bail bond, that defendant was staying at the El Rey Hotel. Officer Moody then obtained defendant's police photo from, and checked his record in, the Records and Identification Bureau; he showed the photo to Officer Wanek and advised him that there was a felony warrant for defendant's arrest in Division 40 for a violation of section 11530, Health and Safety Code (possession of marijuana); they also found that defendant had other marijuana arrests and convictions.

In plain clothes, Officers Wanek, Moody and Tipps then proceeded to the hotel; although the original warrant for defendant's arrest was not in their possession, they knew that it was in the files, Record and Identification, Police Building. After looking at defendant's photograph the assistant manag-

er told the officers defendant was registered under the name of Edgar Davis and lived in room 321, then told Mr. Knowles, the desk clerk, to take the officers up to the room. The officers showed the photograph to Knowles who immediately identified defendant as the person who lived in room 321. None of the officers requested Knowles to take them to defendant's room. According to Knowles, escorting police officers to the room was routine for him, he had done it "over a hundred times." Knowles got the key to room 321 and took the officers up the elevator to the third floor. The officers walked with Knowles to a door where he (Knowles), without any instruction from them, rapped very loudly two or three times on the door with the key calling "Mr. Davis"—"It's the room clerk"; Knowles said he always knocked when taking anyone up to a room. Officer Wanek testified that Knowles actually went to the door and knocked before the officers knew which room was defendant's—"that was something we had no control over whatsoever"; that the officers did not announce their presence before Knowles knocked and did not draw their guns; that the door was opened by defendant who was still in bed (the room was narrow and defendant reached around and opened the door from the bed); that as the door opened he saw defendant sitting on the edge of the bed nude, recognized him from the photograph and, the "instant" they entered the room, arrested him saying, "You are under arrest for a felony warrant"; and that then he gave defendant his constitutional rights.

As defendant got up to dress, Officer Wanek following him; he had to step over an open small black satchel-type leather suitcase directly in front of him on the floor in a narrow walkway beside the bed; the lights were on and he saw lying loosely in the suitcase five or six brown paper bags (denoting narcotics) and on top, several tin-foil rolls of what appeared to him to be pills (denoting benzedrine tablets for sale) together with numerous small packages; he asked defendant if he had any narcotics in the apartment and defendant said "No"; then he said, "If you don't have any narcotics in here, you won't mind if we look around?" and defendant replied, "O.K., if you want to." Officer Moody picked up the suitcase and said, "There is a lot of marijuana and stuff in this suitcase"; it was lifted onto the bed and the officers found quantities of manicured marijuana and debris (125 grams of seeds), dangerous drugs, 2,000 red gelatin capsules, cigarette papers and a white paper bag in the suitcase packaged exactly like a $10 can of marijuana. A user would not

have rolled as many marijuana cigarettes as were found in the suitcase solely for his own use; the loose marijuana would have made about 165 marijuana cigarettes.

Defendant's version of how he came into possession of the suitcase was that he took it from the automobile of a man, who gave him a ride, after he fixed the fan belt for him and found the man asleep; in his room he looked through it and found what it contained. Around 10 p.m. he was asleep when he heard a key turn; he awakened and saw the door open; three men entered and he asked who they were and they said they were officers, "We have a warrant for your arrest"; he asked what for and they replied, "We have a warrant for your failing to appear in court, and possession of narcotics"; he asked what they meant by coming into his room like that and why they did not knock, and they replied, "We have a warrant for your arrest; we don't have to knock"; he asked for whom they were looking and he was told, "Leo Coleman. We got you. Your name is Leo Coleman, Rudy"; he said they were mistaken because his name was not Leo Coleman, "If you notice on the register, my name is Edgar Davis, Jr." (defendant's true name is Leo Coleman).

 There is no merit to appellant's first claim of error that there was an improper consolidation of the two causes for trial. First, his objection to consolidation is not timely made. On November 17, 1966, 13 days before trial, the People moved for consolidation of the two informations; no objection was made and the motion was granted. The trial started on December 1, 1966; on the third day of trial (December 6, 1966) defense counsel moved to sever,[1] and the motion was denied. Second, the trial judge did not abuse his discretion in denying the motion for severance. (§ 954, Pen. Code; *People v. Eudy*, 12 Cal.2d 41, 46 [82 P.2d 359].) Absent in the record is any justification for an order severing the causes for trial. Two days of testimony had already been completed

---

[1] "MR. ANDERSON [deputy public defender]: Yes, your Honor; ready for the defense.

"At this time, your Honor, I would like to make a motion on behalf of Mr. Coleman. It is his feeling that the trial of both of these cases together is prejudicial to him. I suppose the proper motion would be a motion to sever. I realize that it may not be timely, however, this is his desire. He feels that this Court cannot hear both cases and not be prejudicially affected by the fact there are two cases; is that correct, Mr. Coleman? . . .

"MR. ANDERSON: One point further in not opposing this, as far as his own personal interest is concerned. Mr. Coleman did not realize that they would be tried together, rather thought they would be tried consecutively, in two different courts."

when on the third day of a four and one-half day trial defendant for the first time moved for severance. Nor was "good cause shown" for or that "the interests of justice" would be served by an order for severance. All of the offenses charged in the consolidated information are violations of those sections of the Health and Safety Code which denounce the possession of narcotics and dangerous drugs (§§ 11530.5, 11530, 11910); all are similar in that they allege possession (possession for sale of marijuana, possession of marijuana, possession of amphetamine) and all are crimes of the same kind, sort or variety and not, as urged by appellant, unrelated in purpose. ▇ The fact that the offenses charged were committed at different times and places does not deprive the trial court of power to order the consolidation for trial or deny an order for severance if they are of the same class of crimes. (*People* v. *Feigelman*, 65 Cal.App. 319, 320 [223 P. 579]; *People* v. *McClain*, 55 Cal.App.2d 399, 402 [130 P.2d 978].) ▇ The time span here is slightly more than five months (April 15, 1966 to September 20, 1966)—much shorter than that found in cases in which consolidation was held to be appropriate. (*People* v. *Sauer*, 163 Cal.App.2d 740, 744 [329 P.2d 962] [22 months]; *People* v. *Feigelman*, 65 Cal.App. 319, 320 [223 P. 579] [13 months].) Third, appellant has made no showing of substantial prejudice to his rights. In a brief argument without reference to the record or citation of authority appellant claims that he suffered prejudice because he had to overcome the stigma of the earlier offense charged in the consolidated information which was unrelated in time and purpose to the later ones. It is incumbent upon an appellant to show substantial prejudice to his rights, and a bald declaration of his counsel is insufficient on which to base error. (*People* v. *Duane*, 21 Cal.2d 71, 78 [130 P.2d 123].)

▇ Not well taken is appellant's position that the police officers failed to comply with section 844, Penal Code,[2] in that they entered his room and effectuated his arrest without announcing themselves, thus the evidence was inadmissible as the product of an unlawful search and seizure. Accepting as true the testimony of Officer Wanek and viewing the evidence in a light most favorable to the judgment (*People* v. *Sweeney*,

[2]Section 844, Penal Code: "To make an arrest, a private person, if the offense be a felony, and in all cases a peace officer, may break open the door or window of the house in which the person to be arrested is, or in which they have reasonable grounds for believing him to be, after having demanded admittance and explained the purpose for which admittance is desired."

55 Cal.2d 27, 33 [9 Cal.Rptr. 793, 357 P.2d 1049]), it is read-ily apparent that the factual situation does not fall within the ambit of section 844, Penal Code, *People* v. *Arellano,* 239 Cal. App.2d 389 [48 Cal.Rptr. 686], or *People* v. *Reeves,* 61 Cal.2d 268 [38 Cal.Rptr. 1, 391 P.2d 393].

When the officers went to the hotel they intended to arrest defendant under the arrest warrant, and did so. They knew there was outstanding a felony warrant for defendant's arrest for possession of marijuana,[3] and before going up to his room defendant had been identified for them from a police photo, first by the assistant manager, then by Knowles, as the man occupying room 321. Thus, it is clear that the arrest was not based on any facts learned or observed by the officers *after* the door opened but on the arrest warrant[4] and information known and identification made to them before they ever pro-ceeded to the third floor. As a fact, "the instant [they] walked in that door, actually even before [they] walked in . . . before [they] found the narcotics," Officer Wanek arrested defendant and said, "You are under arrest for a felony warrant."

As to the entry, the trial judge found that "the hotel clerk in opening the door did not do so under direction of the officers or as agent of the officers, or under their control." The finding that Knowles acted independently of the officers, is supported by the evidence. The officers at no time had in their possession the key to room 321 nor did they open defendant's door as in *People* v. *Arellano,* 239 Cal.App.2d 389 [48 Cal.Rptr. 686], relied upon by appellant. Knowles got the key and kept it in his possession, and was told by the assistant manager to take the officers up to defendant's room. The officers did not ask the desk clerk to take them or go with them, did not know whether defendant was there and did not know Knowles was going to knock on the door. According to Knowles, who was a defense witness, this was a common occurrence "just routine" with him and he always knocked; however, he did not recall whether he opened the door. According to Officer Wanek, "All we wanted the room clerk to do is tell us which room. Instead, he went to the room and

---

[3]Section 842, Penal Code: "An arrest by a peace officer acting under a warrant is lawful even though the officer does not have the warrant in his possession at the time of the arrest, but if the person so requests it, the warrant shall be shown to him as soon as practicable."

[4]We assume the validity of the warrant for defendant made no request that it be shown to him and has made no attack on its legal sufficiency.

knocked on the door before we knew which room we were going to. That was something we had no control over whatsoever.'' None of the officers knocked on the door, inserted the key in the lock, did anything toward opening the door or opened the door. While defendant said that someone else opened it, Officer Wanek testified that defendant himself opened the door. In no manner was Knowles, even if he opened the door, acting as an agent of the officers or under their direction or instructions or on their behalf.

While Knowles' statement, ''It's the room clerk,'' might be deceptive in that it failed to include the fact of the presence of the police, the evidence demonstrates that Knowles, acting entirely on his own and without police direction, instigation or instruction of any kind, was not an agent of the officers. Thus, if there was any deception in Knowles' statement it was irrelevant to the subsequent police entry. If there be any subterfuge or ruse on the part of the officers it could only be in their failure to speak out, but the evidence shows that time did not permit them to do so. Knowles rapped on the door and spoke to defendant, and the door opened almost before the officers knew they were at defendant's door giving them little or no time in which to say anything. Apparently this was also the view of the trial judge for he remarked that, *''even if* they used subterfuge'' to get in, *People* v. *Reeves,* 61 Cal.2d 268 [38 Cal.Rptr. 1, 391 P.2d 393], would not control because the officers were executing an arrest warrant. In *Reeves,* the officers had no warrant and employed subterfuge to get codefendant to open the door; the court held that when the officers arrived at the hotel and found Reeves to be registered, they did not have sufficient information to constitute reasonable and probable cause to enter the room without a warrant, thus entry gained by subterfuge rendered the subsequent search and seizure invalid. ■ It is well established that if prior to entry the officers have reasonable and probable cause to believe defendant has committed a felony, the fact that they resort to trickery, ruse or subterfuge to get the defendant's door open to arrest him, is immaterial. (*People* v. *Lawrence,* 149 Cal.App.2d 435, 452 [308 P.2d 821]; *People* v. *Brooks.* 234 Cal.App.2d 662, 679 [44 Cal.Rptr. 661]; *People* v. *Hamilton,* 257 Cal.App.2d 296, 302 [64 Cal.Rptr. 578].) Surely a valid arrest warrant is equivalent to the probable cause found in the foregoing cases.

■ Finally, appellant contends that his girl friend and her girl friend should have been called as witnesses, and a

continuance granted for that purpose. On the morning of the
last day of trial defense counsel advised "I have just received
a communication[5] from my defendant which I would like to
read into the record, so everything is clear"; it is "in the
nature of a motion"; "[I]t is the opinion of this defendant
that this particular person [Muriel Jackson] is a material
witness to the case. She did have some bearing on the case,
potentially a rebuttal witness. However, I was unable to locate
her, using the facilities available to me." Defendant's motion
to relieve counsel was denied, then he made various vague
accusations[6] against the officers, prosecutor and defense coun-
sel, charging a conspiracy by which his witnesses and others
had been bribed. The judge invited him to take the stand and
tell what, if any, material evidence was not brought out, but
advised defendant it was not necessary for him to do so; Mr.
Anderson advised defendant to make no statement because he
believed it would be against his (defendant's) best interest.
The objection was sustained and the trial proceeded on the
merits.

Mr. Anderson, deputy public defender, was able and compe-
tent in the defense of his client, even though at times he was
burdened with defendant's interference,[7] and, using available
able facilities, made an effort to locate Miss Jackson but was
unable to do so. He did object to defendant making any state-
ment concerning his charges of bribery but, as pointed out by
the trial judge, "the attorney is in control of the case."
(*People* v. *Mattson*, 51 Cal.2d 777, 798 [336 P.2d 937].) He no
doubt felt, and rightly so, that irresponsible accusations could

---

[5]"THE COURT: Yes. This is yellow paper. It says:
" 'Mr. Anderson, (1) Request Mr. Anderson be relieved from this case
and that this case be removed from this courtroom on the ground of illegal
court procedure, with proof of bribery, negligence, tampering transcript,
everything constitutes conspiracy.
" '(2) Request 998, Article 588 concerning witness be mentioned, the
name Miss Muriel Jackson. . . .'
"Under Item 2, you want her mentioned or brought in here?"

[6]"[A]ll information I have revealed to my lawyer, Mr. Anderson,
has been revealed into the hands of the opposition in this case"; he is
"positive" his key witness, Knowles, had been bribed; "and the second
key witness, including [himself], would be my girl friend who can verify
what the clerk stated to her, as well as I, and the material witness is her
girl friend, and ever since I revealed this information to [Mr. Anderson]
she hasn't been able to be located."

[7]The record is replete with unsworn statements made by defendant to
the court without his counsel's consent; defendant often interrupted the
proceedings by personally addressing the court and making various accu-
sations."

do nothing but adversely affect defendant's best interests. As to the continuance appellant claims the judge should have granted, no abuse of discretion is shown. The record fails to establish the name of the other witness, where the two witnesses resided, what efforts had been made to locate or contact them or obtain their attendance in court, what defendant expected their testimony to be or the materiality of such testimony; except for the bare allegation of his counsel in his opening brief that "apparently this testimony would have cast doubt on the procedure that the police used to enter the appellant's room and whether or not it was a lawful entry," there is nothing before this court to support such claim. (*People* v. *Seals,* 191 Cal.App.2d 734, 739 [13 Cal.Rptr. 7].) The only information given to the trial judge was that defendant's "girl friends girl friend could have verified what the clerk stated to her." Reliance on *People* v. *McCrory,* 41 Cal. 458, and *People* v. *Plyler,* 121 Cal. 160 [53 P. 553], is misplaced because in each case affidavits were submitted showing the witnesses' proposed testimony, if called.

The judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 5, 1968. Peters, J., was of the opinion that the petition should be granted.