[Crim. No. 26345. Second Dist., Div. Two. Sept. 16, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
DAN MORRIS AYERS et al., Defendants and Appellants.

**COUNSEL**

Richard H. Levin, under appointment by the Court of Appeal, Phillip A. Petty and Robert H. Green, for Defendants and Appellants.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**COMPTON, J.**—Eloise Popeil and Dan Ayers were charged in an information with conspiracy to commit murder and with soliciting one Donald Reed and Robert Peeler to commit murder. The objective of the conspiracy and the solicitation was the killing of Eloise's estranged husband Samuel Popeil, a wealthy Chicago businessman.

After a trial which lasted over 60 days and produced testimony consuming some 5,000 pages of transcript, the jury returned a verdict finding Eloise guilty of the solicitation of Peeler, and Ayers guilty of the solicitation of both Reed and Peeler. Both defendants appeal the judgments of conviction.

At the outset we observe that in spite of the highly emotional tone of the case and the length of the trial, the record is remarkably free of error. Defendants do not challenge the sufficiency of the evidence, which was indeed overwhelming, they only contend that the trial court erred in certain evidentiary rulings, in ordering discovery of certain matters in possession of the defense and that the prosecution was guilty of improper argument to the jury.

## THE BACKGROUND

A contested divorce action between Eloise and Sam Popeil had been pending in the courts in Illinois since 1965. Sometime in 1972, Eloise moved to California and shortly thereafter met Dan Ayers and subsequently began to live with him in a meretricious relationship.

Ayers was employed at Douglas Aircraft Company in Long Beach and served as a union shop steward. He was laid off from his job in June 1973. Donald Reed was also employed at that company and served in the capacity of bargaining committeeman for the union. Reed was an ex-convict who had served time in Michigan for armed robbery.

In December of 1973, Ayers contacted Reed and proposed that Reed kill Sam Popeil in exchange for "$25,000, $30,000 or $40,000," stating that "money is no object." Ayers told Reed that Popeil was worth $100 million but "he has all the money tied up, and it's just as much her money as it is his, and he's got to go."

Ayers was able to describe to Reed the layout of Sam Popeil's residence in Chicago and his living habits and directed Reed to go to Chicago and familiarize himself with the layout. Reed agreed.

A few days later Ayers in company with Eloise came to Reed's home. Ayers provided Reed with an airline ticket and a camera. Ayers instructed Reed to go to Chicago, ascend to the 29th floor of the Drake Towers, by way of the fire escape and take a picture of Popeil's door. Ayers drew a map of the area and explained to Reed the location of the garage and stated that if both a Cadillac El Dorado and a Rolls Royce were present, that meant Popeil was home. The purpose of bringing back a picture of the door was to satisfy Eloise that Reed was capable of gaining access to the victim as a condition precedent to her advancing any money.

Reed actually made the trip to Chicago but upon observing the situation decided against going through with the plan. He returned to Los Angeles and contacted Robert Peeler, another fellow employee and union official. Reed told Peeler of Ayers' proposition and the two agreed to try to get the money from Ayers without actually committing the deed. They decided to surreptitiously tape record conversations with Ayers. Several conversations were recorded in which Ayers and Reed discussed the details of the proposed murder.

Around December 31, 1973, Ayers contacted Peeler and proposed that Peeler undertake to carry out the plan because he, Ayers, was getting suspicious of Reed and Reed's intentions. On January 1, 1974, Peeler met with Ayers and Eloise at a restaurant in the Long Beach area. In this conversation Eloise gave Peeler details of her husband's habits, described the presence of domestic help on the premises and opined that it would be easy to get into the apartment in Chicago and shoot the victim in his sleep. She agreed to furnish a map of the premises.

Subsequently, Ayers delivered a map to Peeler. The map was proved to have been made by Eloise. Ayers also discussed with Peeler the possibility of poisoning Popeil instead of shooting him. Ayers delivered to Peeler a prescription bottle containing a white powder with the name "Eloise Popeil" on the label.

On January 3, 1974, Reed contacted Sam Popeil by telephone in Chicago and told him of the plan to kill him. Later that day the Long Beach police contacted Reed. Reed told the police what he knew and delivered to them the evidence he had accumulated. He told them of a meeting between Eloise, Ayers and Peeler that was planned for January 5, 1974.

Subsequently, Peeler agreed to cooperate with the police and conversations he had with Ayers and Eloise were surreptitiously recorded with equipment furnished by the police, while the police observed and photographed the meetings. These conversations left no doubt of Eloise and Ayers' intent and desire to hire someone to murder Samuel Popeil. Eloise said she "wanted him dead" by any means and if it was necessary also to kill the maid to put the bodies in bed together.

### THE TAPES OF THE CONVERSATIONS

Seven tape recordings were received in evidence. It was stipulated that each tape was recorded with the consent and knowledge of one party to

the conversation, and that as to three of the tapes the person so consenting was acting under the direction of a law enforcement officer who was in turn acting within the scope of his authority.

The four tapes recorded without police authorization contained only conversations with defendant Ayers. Yet both defendants claim error in their admission.

Defendants concede that under existing statutory and case law the recordings which were obtained under police direction and supervision would be admissible. (Pen. Code, § 633.)[1] They argue, however, that article I, section 1 of the California Constitution (as reworded by amendment in 1974) protecting the individual's right to privacy, impliedly and implicitly repeals Penal Code section 633. For this contention they rely on *White* v. *Davis,* 13 Cal.3d 757 [120 Cal.Rptr. 94, 533 P.2d 222].

*White* v. *Davis* dealt with the use of police undercover agents to monitor class discussions at a state university. In ruling on the sufficiency of a complaint challenging the legality of such practice the Supreme Court found that a cause of action had been pleaded on the basis that the practice threatened freedom of speech and abridged the students and teachers' "right of privacy."

The court took note, however, that the complaint alleged, and in the face of a demurrer the allegations were accepted as true, that the information gathered by the covert police operation did not pertain to illegal activity and was unnecessary for any legitimate governmental interest. The court further acknowledged that on a trial of the case the police might designate the compelling governmental interest upon which they relied for justification of their actions.

---

[1]Penal Code section 633 provides: "Nothing in Section 631 or 632 shall be construed as prohibiting the Attorney General, any district attorney, or any assistant, deputy, or investigator of the Attorney General or any district attorney, or any officer of the California Highway Patrol, or any chief of police, assistant chief of police, or policeman of a city or city and county, or any sheriff, undersheriff, or deputy sheriff regularly employed and paid as such of a county, or any person acting pursuant to the direction of one of the above-named law enforcement officers acting within the scope of his authority, from overhearing or recording any communication which they could lawfully overhear or record prior to the effective date of this chapter.

"Nothing in Section 631 or 632 shall be construed as rendering inadmissible any evidence obtained by the above-named persons by means of overhearing or recording any communication which they could lawfully overhear or record prior to the effective date of this chapter."

We find nothing in the language of that case that calls into question the validity of the carefully drawn statutes contained in part I, title 15, chapter 1.5 of the Penal Code (commencing with § 630) entitled "Invasion of Privacy" which statutes include section 633. Nor does *White* v. *Davis, supra,* appear to detract from the large volume of case law dealing with the exclusionary rule and the application of the constitutional prohibition against unreasonable search and seizure.

Here the police were pursuing a compelling governmental interest, the prevention of the crime of murder and were gathering evidence of a specific illegal act. The test then is the applicability of the well-established exclusionary rule preventing the use of evidence obtained by constitutionally unreasonable conduct on the part of government agents.

The legality of the recording of either telephonic or face-to-face conversations under the circumstances here is well-established. (*People* v. *Dement,* 48 Cal.2d 600 [311 P.2d 505]; *People* v. *Dontanville,* 10 Cal.App.3d 783 [89 Cal.Rptr. 172].) Hence there was no error in the admission of the recordings made under police supervision.

■ As to the recordings made by Reed and Peeler prior to police intervention, defendants point to Penal Code sections 631 and 632 which make it a crime for private individuals to intercept or record telephonic or other conversations without the consent of all parties to the conversation. Specifically defendants rely on the provision in section 631 that "Except as proof in an action or prosecution for violation of this section, no evidence obtained in violation of this section shall be admissible in any judicial, administrative, legislative or other proceedings," and a similar provision contained in section 632.

The exclusionary rule as a means of enforcing constitutional protection against unreasonable search and seizure is directed against governmental action. (*People* v. *Minervini,* 20 Cal.App.3d 832 [98 Cal.Rptr. 107]; *People* v. *Jackson,* 14 Cal.App.3d 57 [92 Cal.Rptr. 91]; *People* v. *Coleman,* 263 Cal.App.2d 697 [69 Cal.Rptr. 910]; *People* v. *Tarantino,* 45 Cal.2d 590 [290 P.2d 505].) Generally speaking evidence obtained by the illegal act of a private citizen acting in a purely private capacity and without governmental sanction or involvement may be used by the government in a criminal prosecution. Thus the above quoted provision in Penal Code section 631 would appear to us to be designed to deter violations of those sections, as the exclusionary rule is designed to deter police officers from conducting unreasonable searches and seizures, by

denying to the violators of those sections any personal benefit from the evidence so obtained but not necessarily to prevent the government from making use thereof.

This is borne out by the fact that Penal Code section 633.5 provides: "Nothing in Section 631 or 632 shall be construed as prohibiting one party to a confidential communication from recording such communication for the purpose of obtaining evidence reasonably believed to relate to the commission by another party to such communication of the crime of extortion, kidnapping, bribery, any felony involving violence against the person, or a violation of Section 653m, and nothing in Section 631 or 632 shall be construed as rendering inadmissible in a prosecution for extortion, kidnapping, bribery, any felony involving violence against the person, or a violation of Section 653m, or any crime in connection therewith, any evidence so obtained."

The People stipulate that the recordings made by Reed and Peeler were of a type condemned by Penal Code sections 631 and 632 and were made pursuant to a plan to obtain money by pretending to participate in the plot and to perpetuate the information for their own purpose and protection.

Clearly, however, the recordings were made to obtain evidence relating to the commission of one of the crimes enumerated in section 633.5 and were voluntarily surrendered to the police. Defendants, however, would have us bar the use of this evidence because Reed and Peeler's initial purpose was to gather evidence for their own purposes and not to gather evidence for use in a prosecution. They would interpret the phrase "for the purpose of obtaining evidence" to mean for the purpose of instituting a prosecution.

We conclude that such a narrow interpretation of the statute is unwarranted in light of the overall policy of the law as found in the cases dealing with the distinction between police and private citizens in the obtaining of evidence. Further, such an interpretation would place the prosecuting authorities at the mercy of the admitted lawbreaker and make the availability of valuable evidence turn on the lawbreaker's articulation of his own state of mind.

Finally, as an additional reason for upholding the judgments against this claim of error, it must be remembered that both Peeler and Reed testified at the trial and could have testified to all of the matters

contained on the tapes without any contention that defendants' rights were violated. Defendants knew when talking to Reed and Peeler that they could repeat to others what was said. (See *People* v. *Wojahn,* 169 Cal.App.2d 135 [337 P.2d 192].) Additionally the recordings obtained by the police were as damaging as those obtained by Reed and Peeler before the involvement of the police. Any error in admitting the earlier tapes was harmless beyond any doubt.

## THE DISCOVERY ORDER

■ At the close of the People's case the prosecution asked the court to order defendants to turn over statements of defense witnesses and investigator's notes of conversations with those witnesses so that they could be used for possible impeachment.

The trial judge issued an order requiring that such statements and notes be delivered to the court and indicated that they would be screened and only those portions which appeared to have a bearing on the credibility of the witnesses would be delivered to the prosecutor.

Counsel for defendant Ayers refused to comply. Counsel for defendant Popeil complied only to the extent of delivering a copy of an investigator's notes concerning an interview with one witness, a Mrs. Cowan, defendant Popeil's sister.

The thrust of Mrs. Cowan's testimony on behalf of the defense was that she had had several conversations with Sam Popeil in which the latter had expressed an interest in the relationship between Eloise and Ayers and an intent to use evidence of that relationship in the divorce action. According to Mrs. Cowan, Sam Popeil made inquiry as to whether Ayers could be "bought off" or if he could be frightened away by physical force. Sam also attempted to pressure Mrs. Cowan to testify in the divorce action. According to Mrs. Cowan she warned Eloise and Ayers to be careful. The relevancy, and in fact the admissibility of this hearsay evidence, is to say the least questionable.

In any event the prosecution in cross-examining Mrs. Cowan made limited reference to the investigator's notes which had been obtained by way of the discovery order. None of the impeaching questions which were based upon the notes were of significant impeaching value. They only served to show that Mrs. Cowan's testimony was somewhat more expansive than the investigator's notes. Mrs. Cowan explained that her

conversation with the investigator had been very short and that she had never reviewed the notes and could not therefore account for the brevity of the investigator's notes.

In *Prudhomme v. Superior Court,* 2 Cal.3d 320 [85 Cal.Rptr. 129, 466 P.2d 673], the California Supreme Court, while restraining the enforcement of the particular discovery there ordered, did recognize the existence of some limited right to discovery by the prosecution where that discovery could not possibly tend to incriminate defendant or in any way lighten the prosecution's burden of proving guilt in its case in chief.

Following *Prudhomme,* the Supreme Court in *Reynolds v. Superior Court,* 12 Cal.3d 834 [117 Cal.Rptr. 437, 528 P.2d 45], stated at page 837, that ". . . even in the absence of constitutional mandate or enabling legislation this court has inherent power to provide for the orderly administration of justice through judicially declared rules of criminal discovery." The court in that case, however, invalidated a pretrial notice of alibi procedure primarily on the basis that creation of such a procedure was more properly a legislative rather than judicial function.

The order here was not pretrial but after the close of the prosecution's case. It did not serve to lighten the burden of the prosecution (see *Prudhomme, supra*) and nothing which was delivered to the prosecution could in any way incriminate the defendants. The privilege against self-incrimination is personal to defendant and does not extend to statements of third parties called as witnesses. (*United States v. Nobles,* 422 U.S. 225 [45 L.Ed.2d 141, 95 S.Ct. 2160].) In fact the material was, if not irrelevant, exculpatory. There was complete reciprocity in that defendants were afforded full discovery, (see *Wardius v. Oregon,* 412 U.S. 470 [37 L.Ed.2d 82, 93 S.Ct. 2208]) and the trial court carefully screened the material before delivery to the prosecution.

We conclude that the very limited discovery which was afforded to the prosecution was consistent with the principles of *Prudhomme* and *Reynolds.* Admittedly the precise outline of permissible prosecution discovery is yet to be delineated, but under the circumstances here if there was any error it was harmless beyond a reasonable doubt.

### THE PROSECUTOR'S ARGUMENT

Defendants lift from the prosecutor's closing argument a number of isolated statements and assign them as prejudicial misconduct. Most

of the statements alluded to were made without objection thus their propriety cannot be raised for the first time on appeal. (*People* v. *Perez*, 58 Cal.2d 229 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946]; *People* v. *Lyons*, 50 Cal.2d 245 [324 P.2d 556].)

Defendants complain of statements by the prosecutor in which he referred to certain defense testimony as "hog wash," "ridiculous" or characterized certain statements by defense witnesses as "lies."

We have read the argument in its entirety and in context and have concluded that it was entirely within the proper bounds of vigorous advocacy (see *People* v. *Bandhauer*, 66 Cal.2d 524 [58 Cal.Rptr. 332, 426 P.2d 900]) and consisted of simply an appraisal of the evidence which was in the record. The statements were not expressions of personal belief. In fact the prosecutor told the jury that "I might state that when I indicate to you that under what theory the various defendants are guilty as charged, these are the reasonable inferences that should be drawn from the evidence that I've reviewed for you and that you've heard in the court."

## SEQUESTERING THE JURY

Contrary to the current popular trend of defendants seeking to insulate jurors from any contact with the outside world, defendant Ayers claims that the trial court erred in sequestering the jury during its deliberation.

Penal Code section 1121, departing from the former longstanding practice of sequestration, now vests the court with discretion as to sequestering or permitting a jury to separate during its deliberations. It appears to us that only in allowing a jury to separate does a trial court run any risk of impairing a defendant's right to a fair trial.

Certainly, as the trial judge here noted, in a case which lasted some two months and where there had been extensive publicity it was not an abuse of discretion to sequester the jury during the delicate phase of deliberation.

We have considered other contentions of the defendants and find them to be totally lacking in merit. No further discussion is required. The

defendants were fairly tried, the evidence was exceptionally strong and we are convinced that no miscarriage of justice occurred.

The judgments are affirmed.

Roth, P. J., and Fleming, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied November 12, 1975.