[Crim. No. 34184. Second Dist., Div. Two. Sept. 17, 1979.]

THE PEOPLE, Plaintiff and Appellant, v.
IRVING DAVID RUBIN, Defendant and Respondent.

COUNSEL

John K. Van de Kamp, District Attorney, Donald J. Kaplan and Arnold T. Guminski, Deputy District Attorneys, for Plaintiff and Appellant.

Alvin S. Michaelson and Pamela A. Withey for Defendant and Respondent.

James A. Kushner, Fred Okrand, Mark Rosenbaum and Terry Smerling as Amici Curiae on behalf of Defendant and Respondent.

OPINION

FLEMING, J.—On March 16, 1978, Irving Rubin, a national director of the Jewish Defense League, held a press conference in Los Angeles, California, to protest a planned demonstration and march by the American Nazi Party to take place in Skokie, Illinois, on April 20, and to announce the organization of a counterdemonstration to stop the march. During the press conference Rubin held up five $100 bills and offered the following reward: "We are offering five hundred dollars, that I have in my hand, to any member of the community, be he Gentile or Jewish, who kills, maims, or seriously injures a member of the American Nazi Party. This offer is being made on the East Coast, on the West Coast. And if they bring us the ears, we'll make it a thousand dollars. The fact of the matter is, that we're deadly serious. This is not said in jest, we are deadly serious." A criminal complaint was filed, Rubin was held to answer by the examining magistrate, and an information charged Rubin with solicitation of murder in violation of Penal Code section 653f. At a hearing to set aside the information, the trial court found probable cause for Rubin's commitment for trial, in that his statements could be interpreted as solicitation to murder; but the court also concluded that the statements were protected as free speech under the First Amendment, in that although they solicited murder, their form and content indicated a desire to attract national media exposure and evidenced a lack of serious intent to solicit the commission of crime. The court ordered the information set aside, and the People have appealed.

Two issues are presented. First, whether the information should have been dismissed for lack of evidence of intent to solicit murder. Second,

whether defendant's advocacy of crime is constitutionally protected speech and thus immune from prosecution as criminal solicitation.

I

PROBABLE CAUSE SUPPORTS THE INFORMATION

Both the examining magistrate and the superior court found probable cause to believe Rubin had committed a public offense, and the trial court, apart from First Amendment grounds, denied the motion to set aside the information. Such a motion does not tender the issue of the guilt or innocence of the accused or the quantum of evidence necessary to sustain a conviction. Rather it presents the question whether the magistrate could entertain a reasonable suspicion that defendant had committed a crime. The standard has been set out at length in *People* v. *Hall* (1971) 3 Cal.3d 992, 996 [92 Cal.Rptr. 304, 479 P.2d 664]: "An information will not be set aside if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it. 'On a motion to set aside an information, the question of the guilt or innocence of the defendant is not before the court, nor does the issue concern the quantum of evidence necessary to sustain a judgment of conviction. The court is only to determine whether the magistrate, acting as a man of ordinary caution or prudence, could conscientiously entertain a reasonable suspicion that a public offense had been committed in which the defendant had participated.' Neither the trial court in a section 995 proceeding nor a reviewing court on appeal therefrom may substitute its judgment as to the weight of the evidence for that of the committing magistrate. 'Although the magistrate, in reaching his decision, may weigh the evidence, resolve conflicts, and give or withhold credence to witnesses, such a balancing of the evidence is not within the powers of a tribunal reviewing the magistrate's order.' Every legitimate inference that may be drawn from the evidence must be drawn in favor of the information." (Citations omitted.) Defendant argues there was no substantial evidence of his specific intent to solicit the crime of murder, that his only specific intent had been to stimulate action in defense of the Jewish community, that by reason of the lack of evidence of specific intent to solicit murder, probable cause to support the accusation did not exist as a matter of law. The trial court rejected this argument, concluding that Rubin's intent was susceptible to several interpretations, one of which was intent to solicit murder. Solicitation of murder to prevent a march through Skokie, said the judge, would constitute a crime.

We agree with this conclusion of the trial judge, in that under the standard of probable cause defendant's statements could be interpreted as a solicitation of murder. ■ "Solicitation consists of the asking of another to commit one of the specified crimes with intent that the crime be committed." (*People* v. *Gordon* (1975) 47 Cal.App.3d 465, 472 [120 Cal.Rptr. 840].) ■ Defendant's true state of mind, his intent in offering a $500 reward to anyone "who kills, maims, or seriously injures a member of the American Nazi Party," presents a question of fact to be determined by the trier of fact on the basis of evidence produced at a trial. Neither the superior court nor this court is entitled to resolve that question as a matter of law. (*Rideout* v. *Superior Court* (1967) 67 Cal.2d 471, 474 [62 Cal.Rptr. 581, 432 P.2d 197].) Accordingly, apart from First Amendment grounds, the information charging the crime of solicitation of murder is valid and is supported by probable cause.

## II

### SOLICITATION OF CRIME AS PROTECTED ADVOCACY

■ The superior court, after concluding that probable cause existed to support the charge of solicitation of murder, went on to further conclude that Rubin's statements were protected as free speech by the First Amendment. The court arrived at this latter conclusion by deducing from the form and content of Rubin's statements that he had not seriously and truly intended to solicit murder, but had merely sought to attract national media attention. Rubin's statements, in the court's view, constituted no more than political hyperbole, and, as such, were protected against abridgement by the First Amendment. Accordingly, the court set aside the information. Patently, the trial court reached its decision by weighing the quality of Rubin's intent, determining it was not a truly serious intent, and thence concluding that the offer of reward for murder was advocacy rather than solicitation. The court arrived at this result even though Rubin himself at his press conference said he was not speaking in jest and was "deadly serious," and even though the specific intent with which an act is done presents an issue of fact.

In our view the trial court erred in undertaking to evaluate the quality of Rubin's intent.

We start with the demonstrable fact of Rubin's advocacy of violence in the form of murder, mayhem, and serious bodily injury. These acts are crimes, and their solicitation is a crime. Taken at face value, Rubin's

statements invite political assassination. ■ But we must also take into account a demonstrable proposition of law—under the First Amendment to the Constitution free speech may include advocacy of the use of force and violence. This latter proposition is not absolute, and advocacy of crime may be limited under various tests, including those of clear and present danger, of probable danger, of incitement, and of balance. (Emerson, The System of Freedom of Expression (1970) pp. 16, 404-405, 717.) Accordingly, solicitation of murder is not written off the books as a crime, but under certain circumstances its prosecution may be circumscribed by a constitutional freedom to advocate murder.

■ The paradoxical issue before us is the extent to which a summons to crime is protectable as free speech. All tests for protected speech purport to distinguish abstract advocacy of indeterminate measures from concrete solicitation of specific and determinate acts. In a given case the issue is whether the summons is constitutionally protected advocacy of resort to crime in general or whether it is incitement to specific crime prosecutable as criminal solicitation. In past years free speech cases have presented two contrasting images—one, the classroom professor lecturing his students on the need to resort to terrorism to overthrow an oppressive government (constitutionally protected speech; cf. *Sweezy* v. *New Hampshire* (1957) 354 U.S. 234 [1 L.Ed.2d 1311, 77 S.Ct. 1203]); the other, the street demonstrator in the town square urging a mob to burn down city hall and lynch the chief of police (unprotected criminal incitement to violence; cf. *Feiner* v. *New York* (1951) 340 U.S. 315 [95 L.Ed. 295, 71 S.Ct. 303]). But in these days of the global village and the big trumpet the line between advocacy and solicitation has become blurred; and when advocacy of crime is combined with the staging of a media event, the prototype images tend to merge. The classroom becomes a broadcasting studio, the mob in the town square becomes a myriad of unknown viewers and listeners throughout the broadcast area, and the critical distinction between abstract advocacy of crime in general and concrete solicitation of crime in particular breaks down. When, as here, political assassination is urged upon a greatly enlarged audience, the incitement to crime may possess a far greater capacity for civil disruption than the oral harangue of a mob in the town square, for the unseen audience of unknown listeners may contain another Oswald, or Ruby, or Sirhan, or Ray, or Bremer, or Moore, or Fromm, who may respond literally to the invitation of the speaker, regardless of the speaker's true intent. The threat to civil order presented by advocacy of assassination must be realistically evaluated in the light of its potential for deadly mischief.

One other general comment is appropriate. The leading cases evaluating the character of speech as lawful advocacy or as criminal threat/solicitation have all been determined after trial of the general issue to verdict and judgment. (*Schenck* v. *United States* (1919) 249 U.S. 47 [63 L.Ed. 470, 39 S.Ct. 247]; *Dennis* v. *United States* (1951) 341 U.S. 494 [95 L.Ed. 1137, 71 S.Ct. 857]; *Yates* v. *United States* (1957) 354 U.S. 298 [1 L.Ed.2d 1356, 77 S.Ct. 1064]; *Watts* v. *United States* (1969) 394 U.S. 705 [22 L.Ed.2d 664, 89 S.Ct. 1399]; *Brandenberg* v. *Ohio* (1969) 395 U.S. 444 [23 L.Ed.2d 430, 89 S.Ct. 1827]; *Hess* v. *Indiana* (1973) 414 U.S. 105 [38 L.Ed.2d 303, 94 S.Ct. 326]; *United States* v. *Kelner* (2d Cir. 1976) 534 F.2d 1020.) In these cases the quality of the defendant's specific intent to threaten or solicit crime had been evaluated by a factual determination. At bench, we have not yet reached that stage, and the quality of Rubin's specific intent has not been passed upon by a trier of fact.

In considering the motion to set aside the information on First Amendment grounds, the trial court's function was not to evaluate Rubin's specific intent, but rather to analyze the words and circumstances of his offer of reward to anyone "who kills, maims, or seriously injures a member of the American Nazi Party" and determine whether the offer constituted constitutionally protected speech as a matter of law. At that stage of the proceeding once probable cause had been found, Rubin's specific intent to solicit murder became largely immaterial. ▮ Speech is protected or not in the context of its expression and surroundings, and, if protected, the constitutional protection takes hold, regardless of the purity or malignancy of the speaker's motives. If Rubin's speech were constitutionally protected, his intent would be immaterial and could be as murderous as he pleased. However, the controlling factors for First Amendment purposes are not specific intent but the words and attendant circumstances of the offer, which determine whether or not the offer is constitutionally protected speech, even though on its face it solicits the commission of crime. If these words in their setting are protected speech, Rubin cannot be held to answer the charge of solicitation of murder, and the trial court's dismissal was correct. (*Dennis* v. *United States* (1951) 341 U.S. 494, 513 [95 L.Ed. 1137, 1154, 71 S.Ct. 857].) But if the words in their circumstances are not protected speech, the issue turns on Rubin's specific intent, the cause presents an issue of fact for resolution by the trier of fact, and its dismissal was improper.

Thus, on this appeal we are not concerned with Rubin's specific intent. Rather we must evaluate Rubin's words in the light of their attendant circumstances to determine whether mere general advocacy of crime was

involved or whether Rubin's offer of reward taken at face value could reasonably be construed as soliciting the commission of crime and was therefore unshielded by the First Amendment. (Cf. aircraft hijack and bomb threat causes: *United States* v. *Irving* (5th Cir. 1975) 509 F.2d 1325, false information about a future indefinite hijacking attempt not protected as free speech; *United States* v. *Rutherford* (2d Cir. 1964) 332 F.2d 444, intent to destroy airplane is immaterial in offense of bomb threat.)

■ The facts and circumstances which differentiate advocacy of crime from solicitation of crime are those which differentiate advocacy of abstract doctrine from advocacy of incitement to unlawful action (*Yates* v. *United States* (1957) *supra,* 354 U.S. 298, 318-326-327 [1 L.Ed.2d 1356, 1374, 1379, 1380]). Their application may be seen in *Brandenberg* v. *Ohio* (1969) *supra,* 395 U.S. 444 [23 L.Ed.2d 430, 89 S.Ct. 1827], a conviction under Ohio's criminal syndicalism law of a leader of the Ku Klux Klan for advocating the general propriety of crime at a rally held for media reporters during which a cross had been burned and statements made derogatory to Negroes and Jews. In reversing the conviction the court declared that "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." (P. 447 [23 L.Ed.2d, p. 434].) Mere abstract teaching of the moral propriety of resort to force and violence, said the court, is not the same as preparing and steeling a group for violent action. A similar case is *Watts* v. *United States* (1969) 394 U.S. 705 [22 L.Ed.2d 664, 89 S.Ct. 1399], a prosecution for threat against the President by a participant in a public discussion group who had said that if inducted into the Army and made to carry a rifle, "the first man I want to get in my sights is L.B.J." In reversing the conviction the court declared that threat must be distinguished from constitutionally protected speech, that the prosecution must prove a true threat rather than the kind of political hyperbole that occurred here. A recent informative case dealing with threat is *United States* v. *Kelner* (2 Cir. 1976) 534 F.2d 1020, where defendant, a member of the Jewish Defense League, was convicted of transmitting over television a threat to assassinate Yasser Arafat. On appeal, the court rejected the claim of freedom of expression, declined to identify the assassination threat as political hyperbole, and declared it the function of the jury to evaluate the intent behind the threat.

Although these cases deal primarily with threats to assassinate rather than solicitation of assassination they delineate the factors that differen-

tiate advocacy of crime as abstract doctrine from advocacy of crime as incitement to concrete action (cf. *Yates* v. *United States* (1957) *supra,* 354 U.S. 298, 318-324 [1 L.Ed.2d 1356, 1374-1378]). In *Brandenberg* v. *Ohio* (1969) *supra,* 395 U.S. 444, 447 [23 L.Ed.2d 430, 433-434], the Supreme Court suggested evaluation of the language of advocacy in the light of two considerations: (1) its incitement to imminent lawless action; (2) its likelihood of producing such action. (Cf. *Hess* v. *Indiana* (1973) *supra,* 414 U.S. 105, 108 [38 L.Ed.2d 303, 307].) This particular formula parallels the test delineated by Justice Holmes on behalf of the Supreme Court in *Schenck* v. *United States* (1919) 249 U.S. 47 [63 L.Ed. 470, 39 S.Ct. 247], in which, after saying that the most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic, he refers to the test of clear and present danger and declares that protection of free speech is a question of *proximity* and *degree.* We consider the application of these factors to the cause at bench.

*Proximity: Incitement to Imminent Lawless Action.* Since murder is lawless action and an offer of reward for murder is, assuredly, an incitement, imminence is the critical element here in the factor of proximity.  ■  Imminence, a function of time, refers to an event which threatens to happen momentarily, is about to happen, or is at the point of happening. But time is a relative dimension and imminence a relative term, and the imminence of an event is related to its nature. A' total eclipse of the sun next year is said to be imminent. An April shower 30 minutes away is not.  ■  The event which concerns us here was the scheduled Nazi Party demonstration and march to be held in Skokie in five weeks, an event which had already attracted national attention. We think that in terms of political assassination the demonstration could be said to have been proximate and imminent, just as a Papal visit to Belfast, a Soviet chief of state's visit to Rome, a presidential campaign trip to Dallas, and a presidential inauguration in Washington, can each be said to be proximate and imminent, even though occurrence may be some weeks away. The concurring opinion of Judge Mulligan in *United States* v. *Kelner* (1976) *supra,* 534 F.2d 1020, makes this point. "For example, if the threat here had been made in the same setting but had been phrased, 'We plan to kill Arafat a week from today unless he pays us $1,000,000,' I would hold that the threat is still well within § 875(c) and not protected under the First Amendment although the threatened homicide is not immediate, imminent or unconditional under the test proposed by Judge Oakes. We have already held that a threat to assassinate the President some two weeks later is within a comparable statute, 18 U.S.C. § 871. *United States* v. *Compton,* 428 F.2d 18 (2d Cir. 1970), cert. denied, 401

U.S. 1014, 91 S.Ct. 1259, 28 L.Ed.2d 551 (1971)." (At p. 1029.) *United States* v. *Compton, supra,* involved a threat on April 14 to assassinate the President toward the end of April or the beginning of May. Additionally, the seriousness of the threatened crime, i.e. the nature of the lawless action solicited, bears some relationship to its imminence. Generally speaking, the more serious the crime the greater its time span. Murder, the most serious crime of all, carries the longest time span of any crime, as shown by the lack of any time limitation on its prosecution (Pen. Code, § 799) and a threat of murder can be imminent at a time when a threat of trespass is not.

We think solicitation of murder in connection with a public event of this notoriety, even though five weeks away, can qualify as incitement to imminent lawless action.

*Degree: Likelihood of Producing Action.* Here we are concerned with the practicality and feasibility of the solicitation—was it likely to incite or produce violence? We cannot, of course, answer this question with assurance, for the effect of emotional appeals for political violence on the actions of inherently unstable personalities remains obscure. But we think it a reasonable inference that serious reportage by respectable news media of a reward for murder tends in some degree to give respectability to what otherwise would remain an underground solicitation of limited credibility addressed to a limited audience, and thereby tends to increase the risk and likelihood of violence. Undoubtedly, the prosecution's case would be stronger if a specific Nazi Party member had been named as the target for assassination and if the demonstration had been one scheduled to take place in Los Angeles rather than in Skokie. ▆▆▆ Yet murder remains a crime, whether or not a specified victim is identified as the target (*People* v. *Aranda* (1938) 12 Cal.2d 307, 310 [83 P.2d 928]; *People* v. *Smith* (1973) 33 Cal.App.3d 51, 66 [108 Cal.Rptr. 698]; *People* v. *Orabuena* (1976) 56 Cal.App.3d 540, 545 [128 Cal.Rptr. 474]), and solicitation in California of murder in Illinois is nonetheless solicitation of murder. (*People* v. *Ayers* (1975) 51 Cal.App.3d 370 [124 Cal.Rptr. 283].)

▆▆▆ The solicitation to murder here was not made in a jesting or conditional manner, nor was it the outcome of an improvised piece of braggadocio. (Cf. *Watts* v. *United States* (1969) *supra,* 394 U.S. 705, 707 [22 L.Ed.2d 664, 666-667]; *United States* v. *Kelner, supra,* 534 F.2d at p. 1025.) Its words and circumstances suggest the possibility it might incite or produce the violence sought. Rubin himself referred to earlier

bloodshed in St. Louis, and he predicted bloodshed in Skokie unless the permit for the demonstration were revoked. Some of the comments of the court in *United States* v. *Kelner* (1976) *supra,* 534 F.2d 1020, are germane. ". . . we believe that important national interests similar to those in *Watts* exist here, more specifically, the governmental interest of reducing the climate of violence to which true threats of injury necessarily contribute. As a part of the Government's constitutional responsibility to insure domestic tranquility, it is properly concerned—in an era of ever-increasing acts of violence and terrorism, coupled with technological opportunities to carry out threats of injury—with prohibiting as criminal conduct specific threats of physical injury to others, whether directed toward our own or another nation's leaders or members of the public." (P. 1026.)

From the words and circumstances of Rubin's offer we conclude there was sufficient likelihood of his solicitation being interpreted as a call to arms, as a preparation and steelment of his group to violent action, as a systematic promotion of future bloodshed in the streets, rather than as a communication of ideas through reasoned public discussion, to remove it from the category of protected speech and require Rubin to answer the charges against him.

The order setting aside the information is reversed.

Beach, J., concurred.

**ROTH, P. J.**—I dissent.

On March 16, 1978, respondent, a national director of the Jewish Defense League, held a press conference wherein he stated inter alia:

"R: This is a nationwide offer. We absolutely feel desperate in the sense that, as I've said before, in the last nine months the Nazis have gained a tremendous amount of notoriety. They are building a national movement. They've got money behind them, and we're fearful if we allow it to grow. We begged the Jewish community many years ago, that if we don't stop the Nazis now, in several years they'll be marching through our community. And the Jewish community didn't listen and so we were right. And this is the, this is the end result. . . . "[w]e sincerely mean what we say, that we're going after the Nazis. We're not going to relax, we're not going to let up, we're going to declare all out war on people who want to advocate our destruction. . . .

"R: April 20. And the Nazis plan to march through Skokie, Illinois, which is 70% Jewish, 7,000 survivors of the holocaust. They plan to bring big shields with gigantic swastikas on them: they plan to state that, we missed you 30 years ago, and we're going to try it again. As I said before, it will cause a tremendous grief to the people who are living there, specifically, the survivors of the holocaust. And we feel it's a desecration of our God, and we feel it's a desecration of the Jewish people to allow it to happen in the name of freedom of speech. . . . [w]e're deadly serious, that we'll even go to jail, that we'll risk spending time in jail, if we have to, in order to stop the Nazis, because we think we've learned from history. . . .

"R: This was announced the other day in Chicago, when our national director stated that we're there, and we're coming there, and we're going to stop the Nazi march at all cost. And it's a nationwide thing, and we're bringing people as far away as Montreal, Canada. And you can expect a major turnout of Jewish activists, of Jewish militants who are willing to go into the streets and fight Nazis. . . .

"[Questioner:] I need to get one thing clarified before I go off here, ah the $500 reward . . .

"R: Right.

"[Questioner:] Ah that is not just blanket for any Jew or Gentile who maims or seriously injures any member of the Nazi party. Is that for anybody who does this in defense of the Jewish . . .

"R: *That's in defense of the Jewish or Gentile* community. [Italics added.]

"[Questioner:] So it would be incorrect to say just a blanket offer.

"R: You could say it's a blanket offer, providing that they could prove that it was in the defense of the community.

"[Questioner:] Don't you think that you're really opening the door?

"R: No. No. It doesn't enter my mind at all. I want people to know, that if they go out there and they take the consequences of being arrested, in either the attack of an American Nazi or whatever, that there are people who are grateful. That there are people who are right behind them

100%; and if money is a motivating factor, which it seems to be in America, that seems to be the bottom line, yeah. That's where we're at. . . .

"R: We wish to announce two events. On April twentieth, a number of Neo-Nazis perhaps, a hundred fifty, perhaps two hundred, will march into the Jewish area in Skokie, Illinois. We the Jewish Defense League of the West Coast and East Coast will a mass [*sic*] at least five thousand to six thousand people in that area, to literally stop the Neo-Nazi movement. We're not going there under the intention to be pacifists. They like to have a nice non-violent quiet protest. We're going there to take names and bury them if we have to. We're not going to allow Neo-Nazis to come into Skokie and advocate the Judacide of the Jewish people there. We're not going to allow them, with stench of the crematoria still existing in that city, with seven thousand survivors with numbers on their arms. We're not gonna allow them to be insulted, intimidated again by Nazis. We believe if we would have done it thirty years ago there might have been a different story. Many more Jews would have been alive today. And we're going there and we're sponsoring the way of people. If they don't have the money, we're providing them a round-trip ticket from Chicago, Los Angeles, it'll cost us—we now have a travel agent who is going to eliminate his commission, and it'll cost us between a hundred and sixty, a hundred seventy dollars per person. If the individual cannot afford his way, we the Jewish Defense League will be sponsoring him, providing he meets our qualifications. The qualifications [*sic*] is: that he is of sound mind and he is of sound body. And I mean that he is able-willing, ready, and able to handle himself or herself in the streets.

"[Questioner:] Are you really . . .

"R: And that means. We also have an added feature. We are offering five hundred dollars, that I have in my hand, to any member of the community, be he Gentile or Jewish, who kills, maims, or seriously injures a member of the American Nazi Party. This offer is being made on the East Coast, on the West Coat. [*sic*] And if they bring us the ears, we'll make it a thousand dollars. The fact of the matter is, that we're deadly serious. This is not said in jest, we are deadly serious. In the defense of the Jewish community, should any Nazi even dream of attacking a Jew like they did [end of tape.]"

Based upon the foregoing, a complaint was issued on April 3, 1978 charging respondent with violation of Penal Code section 653f and he was held to answer at a preliminary hearing conducted June 9, 1978.

On June 26, an information alleging in one count that appellant had, on or about March 26, solicited "another to commit and join in the commission of the crime of murder. . . ." A hearing on respondent's motion to set aside the information pursuant to Penal Code section 995 was commenced and heard in part on October 27, 1978, and concluded January 18, 1979.

In addition to the excerpts of the speech quoted above, the record upon which the section 995 motion was based makes clear the following facts:

Respondent could not call a meeting at the Press Club; he had to be there by invitation; he did not address a rally of sympathizers for the purpose of stirring them into a frenzy of excitement; he was addressing media representatives seeking to learn what were the plans of the Jewish Defense League in counterdemonstration to a Nazi march in Skokie, Illinois, an event calendared five weeks in the future. In exploitation of that opportunity, respondent, in a speech of approximately 800 words, made the hyperbolized solicitation referred to by the majority, and that included *infra,* to attract attention to a sensitive and explosive national issue and to generate news on a national scale and thus dramatize the obscene insult the Nazis sought to impose on the Jews of Skokie. Rubin, although not gifted with the eloquence of Elie Weisel,[1] did make clear the sole thrust of his speech, to wit: that the Jewish Defense League wanted the world to know that Skokie had been selected by the Nazis with ruthless calculation because it was a small city with a 70 percent Jewish population comprising in that percentage 7,000 Jews who had indelible numbers on their arms identifying them as surviving victims of Nazi concentration camps, and that the Nazis were about to march in Skokie to remind those survivors and also their coreligionists living in Skokie or elsewhere, that Jews, with or without indelible numbers, were marked for extinction.

As posed by the district attorney in his brief, the language relied upon, taken out of context as is the language of the majority, as the basis of a violation of Penal Code section 653f was in pertinent part as follows:

"Q: I need to get one thing clarified before I go off here, ah the $500 reward . . .

"R: Right.

---

[1] See footnote 4, *infra.*

"Q: Ah that is not just blanket for any Jew or Gentile who mains [*sic*] or seriously injures any member of the Nazi party. Is that for anybody who does this in defense of the Jewish . . .

"R: That's in defense of the Jewish or Gentile community.

"Q: So it would be incorrect to say just a blanket offer.

"R: You could say it's a blanket offer, providing that they could prove that it was in the defense of the community.

"Q: Of the Jewish community?

"R: Or Gentile community. It makes no difference. It makes no difference to us."

Appellant argues that settled rules required the trial judge to deny the section 995 motion of respondent (*Rideout* v. *Superior Court* (1967) 67 Cal.2d 471, 474 [62 Cal.Rptr. 581, 432 P.2d 197]) if the magistrate had some rational ground to assume that an offense was committed and relies on *People* v. *Gordon* (1975) 47 Cal.App.3d 465 [120 Cal.Rptr. 840] as authority to show that appellant's solicitation of murder was within the embrace of the settled rule. *Gordon* holds at page 472: "[S]olicitation consists of asking another to commit one of the specified crimes [Penal Code section 653f] *with intent* that the crime be committed." (Italics added.)

On conclusion of the argument on January 18, 1979, the trial judge stated that after examining the preliminary transcript, including by stipulation all statements which were recorded at the March 16 press conference[2] and the officer's testimony, *absent* any consideration of constitutional questions, probable cause to bind appellant over for trial *may not* have been lacking. Speaking to that facet of the argument, the court said in pertinent part:

"When you compare the Rubin language with the statements in the Brandenburg case, the Watts case, Hess vs. Indiana, [1973] 414 U.S. 105,

---

[2]The tape recording made by the police containing the language set out above did not include everything said by respondent at the press conference. While it was introduced in evidence at the preliminary hearing, no transcript thereof was made until some time in November. The transcript rather than the tape was relied on by the trial court, though both counsel agreed the former, with inconsequential exceptions, was an accurate recital of the tape's contents.

. . . the language of Mr. Rubin is more subject to be interpreted as a *true* threat than the language in those cases. [Italics added.]

"At the other end of the cases examined by the Court, Mr. Rubin's language was not as definite and specific as the language in the case of U.S. vs. Kelner,[3] [534 F.2d 1020 (2d Cr. 1976)], or the California case of People vs. Bohmer, [1975] 46 Cal.App.3d 185, and the Court is particularly concerned and drawn to the language in the Bohmer case at page 197, footnote 1, where the Court stated as follows: 'We doubt that the 'imminent lawless action' test of Brandenburg is required in determining the guilt of one who advises the commission of a specific overt physical act which is by definition a crime. Such aiding and abetting is sometimes separated by a substantial distance in time from the actual substantive crime.' "

I note at this point that I do not doubt the constitutionality of section 653f, and absent any First Amendment question, I agree arguendo with the foregoing remarks of the trial judge.

Thereafter, addressing himself to the First Amendment question, the trial judge, with the case of *Watts* v. *United States,* 394 U.S. 705 [22 L.Ed.2d 664, 89 S.Ct. 1399], undoubtedly in mind, determined as a matter of law that Rubin's alleged solicitation in violation of section 653f was not and could not be construed to be a true "solicitation" when listened to or read in the context of Rubin's speech, and was constitutionally protected.[4] In *Watts,* a case construing a United States statute and facts strikingly similar to those at bench, the court said at page 707 [22 L.Ed.2d at p. 667]:

---

[3]Discussed *infra.*

[4]The facts and circumstances which provide the foundation for respondent's news conference remarks and which were *necessarily* considered by the trial court (Evid. Code, § 451, subd. (f)) were more eloquently and poignantly summarized in an address made April 24, 1979, before President Carter's Commission on the Holocaust by Mr. Elie Weisel, a recognized authority on the Holocaust and chairman of the commission, in part as follows:

"We, the few survivors, were left behind to bear witness and tell the tale.

"On my first night in the camp—which was the last for most of my friends, my relatives, my teachers—I wrote:

"Never shall I forget that night, which has turned my life into one long night, seven times cursed and seven times sealed. Never shall I forget that smoke. Never shall I forget the little faces of the children whom I saw being thrown into the flames alive beneath a silent blue sky.

"Never shall I forget those flames which murdered my hopes forever.

"Never shall I forget that nocturnal silence which deprived me, for all eternity, of the desire to live.

"Never shall I forget those moments which murdered my soul and turned my dreams

"Certainly the statute under which petitioner was convicted is constitutional on its face. The Nation undoubtedly has a valid, even an overwhelming, interest in protecting the safety of its Chief Executive and in allowing him to perform his duties without interference from threats of physical violence. See H. R. Rep. No. 652, 64th Cong, 1st Sess. (1916). *Nevertheless, a statute such as this one, which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind. What is a threat* must be distinguished from what is *constitutionally protected speech.* [Italics added.]

". . . But whatever the 'willfulness' requirement implies, *the statute initially requires* the Government to *prove a true 'threat.'* We do not

---

into dust, into smoke . . . Never shall I forget these words even if I am condemned to live as long as God himself.

"What does one do with such memories of fire, with so many fragments of despair? How does one live in a world which witnessed the murder of one million children?

"We didn't know. We still don't. How can anyone explain evil of such magnitude? How can anyone comprehend so much pain and anguish? One cannot conceive of Auschwitz with God or without God. And what about man? Who can understand the calculated depravation of the killers? The indifference of the onlookers? When Jews did have a possibility of leaving Europe, how many countries were there, ready to accept them?

"What was the Holocaust—an end or a beginning? Prefiguration or culmination? Was it the final convulsion of demonic forces in history? A paroxysm of centuries-old bigotry and hatred? Or, on the contrary, a momentous warning of things to come?

"When one group is persecuted, mankind is affected. We must remember that only the Jewish people's extermination was an end in itself. Jewish victims, stripped of their identity and of their death, were disowned by the whole world . . . not for what they did or said, but for who they were—sons and daughters of a people whose suffering is the most ancient in recorded history.

"Every occupied nation, every underground movement received help from London, Washington or Moscow. Not the Jews. They were the loneliest victims of the most inhuman of wars. A single air-drop, a single rescue mission would have proved to them, and to the enemy, that they were not forgotten. But they were forgotten. . .

"And yet, when the nightmare lifted, there was no hate in the hearts of those who survived. Only sadness and hope as well. They were convinced that, after Auschwitz, people would no longer yield to fanaticism, nations would no longer wage war and racism; anti-Semitism and class humiliation would be banned forever.

"Little did we know that, in our lifetime, we would witness more wars, new racial hostilities and an awakening of Nazism. Little did we know that books would appear in many languages offering 'proof' that the Holocaust never occurred. Little did we know that Jewish children would again be murdered in cold blood by killers in Israel.

"The survivors advocated hope, not despair. Instead of choosing nihilism and anarchy, they chose to opt for man. Many went to rebuild an ancient dream of Israel in Israel. They all chose to remain human in an inhuman society—to fight for human rights and against poverty.

"We have learned not to be neutral in times of crisis, for neutrality always helps the aggressor, never the victim. We have learned that silence is never the answer. We have learned that the opposite of love is not hate, but indifference.

"So let us remember for their sake and ours. Memory may be our only hope to save the world from the ultimate punishment—a nuclear holocaust."

believe that the kind of political hyperbole indulged in by petitioner fits within that statutory term. For *we must* interpret the *language* Congress chose *'against the background* of a *profound* national commitment to the principle that debate on public issues should be *uninhibited, robust,* and *wide-open,* and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.' *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 270 (1964). The language of the political arena, like the language used in labor disputes, see *Linn* v. *United Plant Guard Workers of America,* 383 U.S. 53, 58 (1966), is often vituperative, abusive, and inexact. We agree with petitioner that his only offense here was *'a kind of very crude offensive method of stating a political opposition to the President.'* Taken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners, *we do not see how it could be interpreted otherwise."* (Italics added.)

At bench the trial judge, concluding his analysis of the facts, said in pertinent part: "I have read your points and authorities . . . viewing the defendant's statement in its proper context I must agree with the comments that appear on page 11 of the Amicus brief, line 1, where they state: 'Amicus contend that the form and contents of Rubin's communication were used solely to attract nationwide media exposure. The contents *evidence a lack of any serious intentions to solicit the commission of a crime.* His remarks constitute political hyperbole and were merely a crude, offensive method of stating political opposition to the Nationalist Socialist Party.'

"I feel in reading all of the statements made on March 16th, . . . the language used by Mr. Rubin falls within the language protected by the First Amendment." (Italics added.)

The motion to dismiss was thereupon granted. This appeal by the People followed.

In *Watts,* the court deals with a threat in violation of a United States statute[5] admitted to be constitutional. At bench we deal with a solicitation prosecuted under a state statute also conceded to be constitutional.

---

[5]"After a jury trial in the United States District Court for the District of Columbia, petitioner was convicted of violating a 1917 statute which prohibits any person from 'knowingly and willfully . . . [making] any threat to take the life of or to inflict bodily harm upon the President of the United States . . . .'" (*Watts* v. *United States,* 394 U.S. 705 [22 L.Ed.2d 664, 666].)

Tested by the requisites enunciated in *Watts,* the solicitation at bench was not a true "solicitation" any more than was the "threat" in *Watts* a true threat.[6]

*United States* v. *Kelner* (2d Cir. 1976) 534 F.2d 1020 illustrates a true "threat" or "solicitation" as distinguished from the one at bench. The *Kelner* court concedes that determination of threat or solicitation is a matter of law and states at page 1027: "The purpose and effect of the *Watts* constitutionally-limited definition of the term 'threat' is to insure that only unequivocal, unconditional and specific expressions of intention immediately to inflict injury may be punished. . . ." *Kelner* then proceeds to show that the facts before it as to a threat were "unequivocal, unconditional and specific expressions of intention immediately to inflict injury" and discusses intent, general and specific, to show the certainty, immediacy and the lack of the conditional nature of all the facts and circumstances before it.

In *Kelner,* the stated pertinent facts are: ". . . Miller was assigned to cover the JDL press conference. When he and his film crew arrived at the JDL headquarters, the conference had already started. Appellant, Kelner, was seated in military fatigues behind a desk with a .38 caliber 'police special' in front of him. To Kelner's right another man was dressed in military fatigues. Miller heard one of the several reporters at the conference ask Kelner whether he was talking about an assassination plot, and heard Kelner answer in the affirmative. The WPIX crew quickly filmed general shots of the press conference without sound for use as a 'lead-in' on the news and then began filming an actual interview of Kelner by Miller. . . .

"Kelner: We have people who have been trained and who are out now and who intend to make sure that Arafat and his lieutenants do not leave this country alive.

"Miller: How do you plan to do that? You're going to kill him?

"Kelner: I'm talking about justice. I'm talking about equal rights under the law, a law that may not exist, but should exist.

---

[6] "'They always holler at us to get an education. And now I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J.' 'They are not going to make me kill my black brothers.' On the basis of this statement, the jury found that petitioner had committed a felony by knowingly and willfully threatening the President. The United States Court of Appeals for the District of Columbia Circuit affirmed by a two-to-one vote. 131 U.S.App.D.C. 125, 402 F.2d 676 (1968). We reverse." (*Watts* v. *United States,* 394 U.S. 705, 706 [22 L.Ed.2d 664, 666].)

"Miller: Are you saying that you plan to kill them?

"Kelner: We are planning to assassinate Mr. Arafat. Just as if any other mur—just the way any other murderer is treated.

"Miller: Do you have the people picked out for this? Have you planned it out? Have you started this operation?

"Kelner: Everything is planned in detail.

"Miller: Do you think it will come off?

"Kelner: It's going to come off.

"Miller: Can you elaborate on where or when or how you plan to take care of this?"

The alleged solicitation at bench considered in the context of the speech was hyperbole with respect to a vital and explosive public issue, conditioned on the defense of the Jewish and Gentile community with respect to an event planned 5 weeks in the future and 2,000 miles removed from Los Angeles; the language of the solicitation had no immediacy and was uncertain, vague and general.

The Supreme Court of the United States disposed of *Watts* on a writ of certiorari without a hearing and decided summarily as a matter of law that the threat involved in that case was not a true threat.

"The motion for leave to proceed *in forma pauperis* and the petition for a writ of certiorari are granted and the judgment of the Court of Appeals is reversed. The case is remanded with instructions that it be returned to the District Court for entry of a judgment of acquittal." (*Watts* v. *United States, supra*, 394 U.S. at p. 708 [22 L.Ed.2d at pp. 667-668].)

The trial court's conclusion as a matter of law that Rubin's remarks were not a "true" solicitation in violation of Penal Code section 653f but were embraced in the First Amendment as permitted speech, in my opinion follows the law thus enunciated.

I would affirm.

A petition for a rehearing was denied October 12, 1979. Roth, P. J., was of the opinion that the petition should be granted. Respondent's petition for a hearing by the Supreme Court was denied November 15, 1979. Bird, C. J., and Mosk, J., were of the opinion that the petition should be granted.