[Crim. No. 43609. Second Dist., Div. Six. July 2, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
ROY LEE MILEY, Defendant and Appellant.

28

COUNSEL

Michael S. Mink, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Robert F. Katz and Carol Slater Frederick, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

STONE, P. J.—Roy Lee Miley appeals from a judgment of the trial court sentencing him to five years in state prison; four years for solicitation and one year because he was "armed" with a deadly weapon. (Pen. Code, § 12022, subd. (a).)

## THE CASE

Appellant was a deputy sheriff for the Ventura County Sheriff's Department from 1962 to 1980. While so employed, he met Michael Douglas, also a deputy sheriff. Douglas left the department in 1979 and moved out of the area. Appellant resigned in 1980 and opened a sporting goods store specializing in guns and fishing tackle.

In late 1980, Douglas returned to Ventura and met up with appellant in appellant's store. Appellant employed him as a part-time clerk during the 1980 Christmas season and on occasional weekends for the next few months. Douglas also worked as an investigator for appellant's private investigation agency.

During this period, both appellant and Douglas were experiencing marital difficulties. They developed a social relationship, complaining to each other about their respective wives. On several occasions, appellant expressed his desire that "something happen to [Carole]" and that he "get rid of her."

In June of 1981, appellant separated from Carole and dissolution proceedings commenced. She remained in the family residence with her two daughters by a prior marriage, Michelle and Ginelle. The parties kept in contact because Carole was the bookkeeper for the family business. Appellant retained his keys to the residence so that he could deliver the "books" for Carole to work on in the evenings.

Appellant was concerned that a dissolution would cost him some money; the sporting goods business was heavily in debt and unable to pay its bills. Apparently, he decided that it would be cheaper to have Carole killed than it would be to dissolve their marriage.

By early October[1] appellant's complaints became quite specific: he told Douglas that he stood to lose $16,000 to $18,000 as a consequence of the dissolution, and that he wanted to find someone to "knock his wife off."

A few days later, appellant offered Douglas $2,500 to kill Carole. He told Douglas that he could use a gun from the store, one which had been sold but which was being held for the 15-day registration waiting period. Douglas told appellant that he would have to think about it.

Fortunately for Carole, Douglas contacted an investigator for the district attorney's office. The sheriff's department was called in, and listened-in by

---

[1]The parties were scheduled for a hearing in their dissolution action on October 22 or 23.

telephone or "Fargo" unit on the remainder of Douglas' conversations with appellant.

On October 12, 1981, at the request of law enforcement, Douglas arranged a meeting with appellant. Douglas was instructed to obtain the details of appellant's proposal. He did.

Appellant reiterated that Douglas could use a gun from the store and explained that the weapon could be cleaned and the barrel "reworked" so that the weapon could not be traced. He showed Douglas two guns which he thought would be suitable.

Appellant stressed that the murder must occur prior to the up-coming court date; he suggested the following Monday night when Carole would be at home working on the books. Douglas was instructed to make the killing appear to have occurred during a robbery or rape. Appellant was not sure whether Carole's daughters would be home on the evening in question; his statement to Douglas was: "They're no use. You're going to have to kill them too."

Douglas then upped the price from $2,500 to $3,000; appellant agreed and said he would have some "front money" and a weapon available to Douglas within a few days.

On October 15, 1981, appellant met with Douglas and gave him a bag containing $50, a .38 revolver, a box of ammunition, and a key to Carole's residence. Appellant drew a diagram of the house and the lighting system, explaining Carole's habits and where she would most likely be found. There was further discussion regarding Douglas' setting up the crime to look like a rape/murder.

Appellant described the cars driven by Carole's daughters; he could not "guarantee" that they would be gone. If either of the girls were home, appellant instructed Douglas: "better do her too. You don't want any witnesses. They both know you."

Appellant assured Douglas that he had no qualms about the plan. Douglas then left appellant's office and delivered the money, gun, ammunition and key to the officers waiting outside.[2] Appellant was arrested shortly thereafter.

---

[2]Douglas left behind the diagram of the house. It was seized during a later search of appellant's office.

Appellant's defense was that Douglas was the "solicitor," and that Douglas was constantly pressuring appellant to allow him to kill Carole because he needed the money. Appellant testified that he went along with the conversations only to determine whether Douglas was serious.

Several law enforcement officers testified that Douglas had a reputation for violence and aggression and that Douglas had told them that he wanted to become a "hit man" because "the money was good and there was a lot of work to be done."

Appellant explained that the $50 he gave Douglas was for the purchase of a gun, and that the revolver and ammunition were provided to Douglas for target practice.[3] Appellant testified that he thought he gave Douglas the "wrong" key.

Because he felt that Douglas would not do anything until he was paid, appellant thought he had plenty of time to report the matter to law enforcement.

Appellant was arrested immediately after the conversation on October 15. He was first charged with six counts of solicitation (three murders, one burglary, one robbery and one rape). It was also alleged that, at the time of the commission of each offense, he was armed with a deadly weapon.

The first jury deadlocked and the court declared a mistrial. Prior to re-trial the court consolidated certain counts,[4] the prosecution amended the information, and appellant proceeded to trial for one count of solicitation which alleged four acts: the murder and rape of Carole, and the murders of her two daughters. Despite appellant's protestations that Penal Code section 12022, subdivision (a) did not apply, the court refused to strike the "armed" allegation.

The jury found appellant guilty as charged: they also found that he was armed with a revolver at the time of the commission of the offense.

---

[3] A criminalist testified that the ammunition which appellant gave Douglas was designed for target shooting. However, the gun was not one which would be commonly used for hunting. The combined effect of the gun and ammunition was the ability to penetrate the skull at close range.

[4] Defense counsel's motion displayed great foresight. In *People v. Cook* (1984) 151 Cal.App.3d 1142 [199 Cal.Rptr. 269], the First District held that, where multiple victims are involved, the question of whether there is one solicitation or several depends on the circumstances. In *Cook*, the solicited killings "might have to occur at different times and places, and perhaps by different means." Accordingly, the court upheld Cook's conviction of four counts of solicitation to commit murder. In this case, on the other hand, the solicited crimes were all part of one package; each offense would be consummated (or not) depending upon the circumstances encountered by the solicitee. Therefore, the consolidation was proper.

## I. Penal Code Section 12022 (a) Does Not Apply

Viewing the evidence in the light most favorable to respondent (*People* v. *Patino* (1979) 95 Cal.App.3d 11 [156 Cal.Rptr. 815]), appellant delivered the gun to Douglas on October 15 so that Douglas could use the weapon to kill Carole. We hold that under those circumstances Penal Code section 12022, subdivision (a) does not apply.

The section provides, in pertinent part, that "[a]ny person who is armed with a firearm *in the commission . . . of a felony* shall, upon conviction . . . in addition and consecutive to the punishment prescribed for the felony . . . be punished by an additional term of one year . . . ." (Italics added.)

A person is "armed" within the meaning of section 12022, subdivision (a) when he carries a weapon as an instrument of offense or defense at the time of the commission of the felony. (*People* v. *Pheaster* (1963) 215 Cal.App.2d 754 [30 Cal.Rptr. 363]; see also *People* v. *Washington* (1971) 17 Cal.App.3d 470, 474 [94 Cal.Rptr. 882] (disapproved on other grounds in *People* v. *Najera* (1972) 8 Cal.3d 504 [105 Cal.Rptr. 345, 503 P.2d 1353]); *People* v. *Hays* (1983) 147 Cal.App.3d 534, 545 [195 Cal.Rptr. 252].)

The purpose of the section has been explained by the Supreme Court: "armed" felons are considered more dangerous, and therefore punished more severely, because of the potential harm they pose to their victims and to those who might attempt to interrupt the commission of their crimes. (*People* v. *Chambers* (1972) 7 Cal.3d 666 [102 Cal.Rptr. 776, 498 P.2d 1024].)

Appellant was not armed with the gun as a "means of offense or defense" at the time of the *solicitation*. As the trial court noted, the increased risk of harm was to the projected victim of the crime which was being solicited and not to any person present at the time the crime of solicitation was being committed. That potential harm is too remote to call into play the enhanced sentence provisions of Penal Code section 12022, subdivision (a).

To date it appears that no California court has addressed this precise issue. However, the Arizona Supreme Court considered a similar issue in *State* v. *Johnson* (1982) 131 Ariz. 299 [640 P.2d 861], where defendant solicited two government agents to kill certain parties by means of explosives to be detonated by remote control.

In Arizona, sentencing courts must consider as an aggravating circumstance the "Use, threatened use or possession of a deadly weapon or dan-

gerous instrument during the commission of the crime." (A.R.S. § 13-702(D)(2).) The Arizona trial court found aggravating circumstances for the stated reason that: "Implicit in the [solicitation] was the fact that dangerous dynamite or explosives [were] to be used."

The Arizona Supreme Court reversed: "The court therefore considered that the crime which was being solicited would have involved the use of a deadly weapon or dangerous instrument. This is clearly erroneous. Under the language of the statute, the court must determine whether the aggravating circumstances existed 'during the commission of the crime.'"

We think the same reasoning applies here. Appellant's purpose in having the gun on October 15 was to insure that *Douglas would be "armed"* when he went to kill Carole. As the trial court noted, the appropriate offense or enhancement in appellant's case would be "furnishing" a gun. California, however, has no such statute,[5] and courts cannot compensate for the omissions of the Legislature by stretching statutes beyond their reasonable and intended application. The one-year Penal Code section 12022, subdivision (a) enhancement must be stricken.

## II. APPELLANT WAS PROPERLY CONVICTED OF SOLICITING THE MURDERS OF CAROLE'S DAUGHTERS

■ Appellant does not challenge the sufficiency of the evidence to sustain his conviction for soliciting the murder and rape of Carole. He attacks only the solicitation of the murders of her daughters, and argues (a) that the class of victims was too indefinite, i.e., that the killing of the daughters was contemplated only because "there were to be no witnesses," and (b) that the solicitation was not "unconditional"; i.e., the girls were to be murdered *only if* they were at home when Douglas killed Carole. We disagree.

■ Solicitation consists of the asking of another to commit one of the crimes specified in Penal Code section 653f with the intent that the crime be committed. (*People* v. *Rubin* (1979) 96 Cal.App.3d 968 [158 Cal.Rptr. 488].) Intent may be inferred from the circumstances attendant to the request. (*People* v. *Gordon* (1975) 47 Cal.App.3d 465 [120 Cal.Rptr. 840].)

■ The crime is complete once the request is made, and no steps need be taken to consummate the target offense. (*People* v. *Rissman* (1957) 154 Cal.App.2d 265 [316 P.2d 60].) That is so because one of the purposes of

---

[5] In Tennessee, for example, it is a substantive offense for anyone to possess a firearm of any character while committing, attempting to commit, or *conspiring* to commit a felony. (T.C.A. § 39-6-1710.) In Pennsylvania, it is a misdemeanor to "possess any instrument of crime with intent to employ it criminally." (18 Pa.C.S.A. § 907.)

the statute is to *avoid citizen exposure to inducements to commit crime.* (*People* v. *Burt* (1955) 45 Cal.2d 311 [288 P.2d 503, 51 A.L.R.2d 948].)

 Unlike other criminal offenses, in the crime of "solicitation" the harm *is* the asking—nothing more need be proven.

The evidence establishes that Carole's daughters were to be killed *if* they were home when Douglas murdered Carole. Although they were the only potential "witnesses" discussed between appellant and Douglas, appellant argues that the instruction to kill "witnesses" does not constitute solicitation because it creates an "undefinable class contemplating an infinite number of victims."

That is simply not so. A direction to kill all witnesses contemplates a specific, ascertainable class of victims. The request is no less a solicitation because appellant cannot name them in advance. (See e.g., *People* v. *Rubin, supra,* 96 Cal.App.3d 968, upholding an information which charged defendant with soliciting the killing, maiming or serious injury of "any member of the Nazi Party.")

The real problem here, if any there be, is that the girls were to be killed *only if* they were home. Appellant characterizes this as a "contingent solicitation," and therefore no solicitation at all.

We note initially that neither the statute nor the cases which construe it require that a solicitation be "unconditional." It is probably fair to say that a great many solicitations for murder are "conditional"; the payment of a certain sum is the condition precedent to the killing. Yet, it could not be argued that the solicitation is not complete until the money is paid; the payment merely affects whether or not the object of the solicitation will be consummated.

The same is true in this case. The "contingency" affects whether the girls will be murdered; the solicitation is complete upon the asking. (*People* v. *Rissman, supra,* 154 Cal.App.2d 265.) Appellant cannot save himself from a conviction for solicitation merely because, due to some circumstance entirely beyond his control, his intended victims may save themselves from death.

III. The Diagram Was Lawfully Seized Under the Doctrine of Plain View

 Appellant challenges the denial of his Penal Code section 1538.5 motion to exclude the diagram of Carole's residence which was seized during a search of his office pursuant to a valid search warrant.

Appellant's first argument is correct: the diagram was not validly seized pursuant to the warrant. Although the warrant lists "a hand-drawn map of a residential structure" as an item to be seized, the affidavit omits any reference whatsoever to that item. (*Thompson* v. *Superior Court* (1977) 70 Cal.App.3d 101 [138 Cal.Rptr. 603].)

The issue is whether the seizure of the map was valid under the doctrine of "plain view." We agree with the trial court that it was so justified.

■ The "plain view" exception to the warrant requirement allows officers, in the execution of a valid search warrant, to seize articles which, although not included in the warrant, are reasonably identified as contraband when such articles are initially in the plain sight or subsequently come into plain sight as a result of the search. (*Skelton* v. *Superior Court* (1969) 1 Cal.3d 144, 157 [81 Cal.Rptr. 613, 460 P.2d 485].)

■ The "nexus rule" was developed to preclude indiscriminate seizure; the officer must be aware of some specific and articulable fact from which a rational link between the item seized and criminal behavior can be inferred. (*People* v. *Superior Court* (*Meyers*) (1979) 25 Cal.3d 67, 73 [157 Cal.Rptr. 716, 598 P.2d 877].)

■ Appellant claims that the nexus requirement was not satisfied here because no evidence was presented at the 1538.5 hearing that "the map seized was the one in question."[6] He would have us interpret the nexus rule to require not merely a "rational link" between the items seized and the inference of criminal behavior, but an "actual link" i.e., the article would be admissible only if the officer was correct in his belief that the items seized was contraband. That is not required.

The officer testified that, before he entered the office to execute the warrant and while he was standing in the public hallway outside, he saw a diagram lying on the floor in the interior office. Once inside, on further inspection, he verified that it was a diagram of the floor plan of a house. He seized it because Douglas had told him that appellant had drawn a diagram of Carole's house so that Douglas could locate Carole within the residence and shoot her.

"The necessary nexus . . . is patently obvious. Although the exact nature of the [diagram] may not have been ascertainable to the searching officers, it was definitely suspect and its seizure was reasonably necessary in order

---

[6]Douglas did not testify at the section 1538.5 hearing. He did, however, verify that the map seized was the one in question prior to its admission into evidence at trial.

to establish its evidentiary value." (*People* v. *Ramos* (1982) 30 Cal.3d 553, 573 [180 Cal.Rptr. 266, 639 P.2d 908] (reversed on other grounds in *California* v. *Ramos* (1983) 463 U.S. 992 [77 L.Ed.2d 1171, 103 S.Ct. 3446]; see also *Cooper* v. *Superior Court* (1981) 118 Cal.App.3d 499 [173 Cal.Rptr. 520].)

The diagram was validly seized and properly admitted into evidence.

IV. THERE WAS NO ERROR IN ALLOWING THE JURY TO UTILIZE THE TRAN-SCRIPTS OF THE TAPE RECORDINGS

 Several conversations between appellant and Douglas between October 12 and October 15 were tape-recorded. When the prosecutor introduced the tapes at trial, he offered transcripts of the recordings as well. Defense counsel objected to the jury's "reading along" from the transcripts while the tapes were played on the ground that the tapes were, in part, unintelligible and the contents of the transcripts therefore speculative. Counsel also objected that appellant would be prejudiced (Evid. Code, § 352) because the jury would over-emphasize the evidentiary value of the recordings if they were supplemented by the transcripts.

Appellant raises those same issues on appeal; the arguments have no merit.

 "To be admissible, tape-recordings need not be completely intelligible for the entire conversation as long as enough is intelligible to be relevant without creating an inference of speculation or unfairness." (*People* v. *Demery* (1980) 104 Cal.App.3d 548, 559 [163 Cal.Rptr. 814]; *People* v. *Barajas* (1978) 81 Cal.App.3d 999, 1011-1012 [147 Cal.Rptr. 195], disapproved on other grounds in *People* v. *Laiwa* (1983) 34 Cal.3d 711, 727 [195 Cal.Rptr. 503, 669 P.2d 1278].)

 Transcripts of such tape recordings are only prejudicial if it is shown that they are so inaccurate that the jury might be misled into convicting an innocent man. (*People* v. *Fujita* (1974) 43 Cal.App.3d 454, 472-473 [117 Cal.Rptr. 757].) That is not the case here.

 The trial court took great care in the exercise of its discretion pursuant to Evidence Code section 352: the judge listened to the tapes and compared them with the transcripts prior to ruling on appellant's motions; several portions of the transcripts were marked out because the court determined that they were not an accurate reflection of the contents of the tape-recordings. (Cf. *People* v. *Spencer* (1963) 60 Cal.2d 64, 80, fn. 9 [31 Cal.Rptr. 782, 383 P.2d 134].)

A review of the tapes in comparison with the transcripts reveals that certain portions of the tapes are unintelligible; there are corresponding blanks in the transcripts. We find the printed words no more harmful than the tapes themselves, which memorialize appellant's cold-blooded solicitation of the murder of his wife and, if necessary, her daughters.

That evidence was obviously "prejudicial," so is all evidence of guilt. What section 352 requires, however, is "undue prejudice" or danger of confusing the issues or misleading the jury. That was not present here; the trial court did not abuse its discretion.

V. CONCLUSION

The judgment shall be modified to strike the one year enhancement pursuant to Penal Code section 12022, subdivision (a). In all other respects, the judgment is affirmed.

Abbe, J., and Gilbert, J., concurred.