Filed 12/17/13

# CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B244557 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA090057) |
| v. | |
| JOSE ARMANDO ALGIRE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Tomson T. Ong, Judge. Affirmed.

Bernstein Law Office, Inc., Bob Bernstein and Nathaniel Clark for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and Robert C. Schneider, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*]     Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of part B of the Discussion.

Appellant Jose Armando Algire challenges his conviction for forcible sexual penetration. He maintains that the trial court erred in admitting a recorded conversation, denying a continuance, and limiting his expert's testimony. In the published portion of this opinion, we reject appellant's contention that the trial court contravened the exclusionary rule in Penal Code section 632, subdivision (d), in admitting an audio recording of a conversation between appellant and his victim. We conclude that the "Right to Truth-in-Evidence" provision of the California Constitution (Cal. Const., art. I, § 28, subd. (f), par. (2)), as enacted by the passage of Proposition 8 in 1982, abrogated that exclusionary rule. In the unpublished portions of the opinion, we reject appellant's remaining contentions. We therefore affirm.

## PROCEDURAL BACKGROUND

On March 14, 2012, an information was filed, charging appellant with sexual penetration with a foreign object (Pen. Code § 289, subd. (a)(1)).[1] Appellant pleaded not guilty. A jury found appellant guilty as charged. On October 3, 2012, the trial court sentenced appellant to a term of eight years in prison.

## FACTS

A. *Prosecution Evidence*

Stevie J., appellant's victim, is also his step-daughter.[2] Stevie was born in China in 1988. In April 2006, following her mother's marriage to appellant, Stevie

---

[1]    All further statutory citations are to the Penal Code, unless otherwise indicated.

[2]    Although the information identifies the victim as Wen S., Stevie testified that she changed her name from Wen S. when she became a United States citizen.

2

came to the United States to live with her mother, appellant, and his two children. She was then 17.

Stevie testified as follows: When she took up residence with appellant, he repeatedly hugged her. Stevie initially believed that his conduct was a "Western cultural thing," as it did not occur in China. Appellant soon began trying to kiss her during the hugs, and also engaged in other inappropriate behavior. On one occasion, he told her that when he was young, a neighbor compensated him for mowing her lawn by having sex with him. On another occasion, appellant approached her from behind while she was reading a book, and placed his hands on her breasts. When Stevie pushed him away, he said that if she discussed the incident with her mother, he would "kick [Stevie] back to China." Stevie said nothing to her mother regarding appellant's misconduct because she did not want to endanger her mother's marriage.

On October 25, 2006, while Stevie's mother was absent, appellant asked Stevie to enter his bedroom. When she did so, he pushed her onto the bed and kissed her. He then moved his hands to her underwear and inserted his fingers into her vagina. Stevie struggled away from him, went to her room, and locked the door. Appellant said through the door, "If you tell anyone[] else[,] including your mom, I'm going to kick you guys back to China and your green card is over, the marriage is over." Stevie contacted a friend, who accompanied Stevie to a park. There, Stevie told the friend only that appellant had threatened her. Stevie did not expressly report appellant's sexual misconduct to anyone, as she was fearful that doing so would end her mother's marriage.

In December 2006, after her natural father died in China, Stevie visited China for approximately six months. During Stevie's visit, appellant informed her by e-mail that he wanted to teach her about sex. She rejected his proposal.

3

In May 2007, following Stevie's return from China, appellant again asked her to enter his bedroom. She refused to do so, but stood in the bedroom doorway. Appellant directed her attention to a computer screen, which displayed a pornographic image involving a man and woman. When he asked whether Stevie wanted him to do what the image showed, she refused and tried to leave, but he grabbed her arm. She kicked him and ran to her room. Stevie related the incident to no one.

A few days later, while appellant was giving Stevie a driving lesson, he asked whether she wanted him to teach her about sex. He explained that it was permissible for him to do so because she was not his "blood daughter." When she replied that she did not want to learn about sex from him, he said, "[S]chool's over, [your] green card is over, and you [will] go back to China." Because Stevie's conditional green card expired in 2008, she understood appellant to mean that he intended to send her back to China.

Immediately after the incident, Stevie contacted Tae Boettcher, whom she knew through her karate class. When Stevie told her that appellant wished to have sex with Stevie and threatened her immigration status, Boettcher arranged for Stevie to see a counselor at the high school she had attended. Before talking to the counselor, Stevie told her mother that appellant had acted improperly toward her. The counselor directed Stevie to the high school police, who told her they could not offer assistance because she was then 18 years old. In addition, the counselor located an alternative residence for Stevie and urged her to move out of appellant's house. Stevie decided to do so. After moving out of appellant's residence, she found employment in a food court in a shopping mall, and met Torrance Police Department Officer Steven Janguard, who also worked in the mall.

In December 2007, appellant told Stevie and her mother that they needed to contact a lawyer in order to renew Stevie's green card. Later, in January 2008,

4

appellant and Stevie went to their lawyer's office in order to sign some paperwork. Although Stevie's mother was supposed to accompany them, she was not present. After meeting with the lawyer, appellant and Stevie had a conversation. While appellant talked to her, he used the word "orgasm," which she did not understand. According to Stevie, she had a practice of recording conversations "[t]o help [her] . . . learn English." She thus began recording their conversation.[3]

During the conversation, appellant stated that the last time he touched Stevie, she was not "wet at all," and that he believed that she needed instruction in sex from him because her body did not "understand what [was] happening." She rejected his proposal. Stevie's recording of the conversation was played for the jury.

After the incident, Stevie told Janguard that she had "issues" with appellant. Janguard suggested that Stevie arrange a meeting with appellant at the mall where she worked, so that Janguard could try to overhear their conversation. Although the meeting occurred, appellant said little during it. Shortly afterward, Stevie received a letter from appellant. The letter stated that if she stopped making her accusations against him, he would assist her in obtaining her a green card. She did not respond to the letter. Later, her lawyer told her that appellant had withdrawn his sponsorship of her green card application. She asked for advice from Janguard, who later acted as her sponsor.

Stevie had no further dealings with appellant, and did not participate in his and her mother's divorce. In 2009, Stevie had her breasts removed because they reminded her of what appellant had done to her. In April 2010, after the renewal of Stevie's green card, she reported appellant's sexual misconduct to the police.

---

[3]     The conversation was recorded on Stevie's cell phone.

Boettcher testified that she became friends with Stevie through Stevie's karate lessons. According to Boettcher, when Stevie told her that appellant had "touched" her, Boettcher arranged for Stevie to meet with a counselor and police officers at Stevie's high school. In addition, Boettcher helped Stevie find a new place to live.

Officer Janguard testified that he met Stevie in a mall where they both worked. In January 2008, while in the mall's food court, Stevie told him that she was having problems with appellant, but did not specify the nature of the problems or identify them as a crime. In addition, she played an audio recording of a conversation between Stevie and appellant. According to Janguard, the background noise in the food court made the recording difficult to understand, but it appeared to Janguard that appellant had made inappropriate remarks to Stevie.

After consulting with a police sergeant, Janguard asked Stevie to arrange a meeting with appellant in the mall. When the meeting took place, Janguard approached appellant and asked him to "listen to Stevie" because "there [was] some inappropriate talking going on." Appellant said nothing to Janguard. Janguard then walked away from Stevie and appellant. Although he saw them talking, he did not overhear their conversation. A few weeks later, Stevie told Janguard that appellant had withdrawn his support for her green card. After learning that Stevie needed to renew her green card, Janguard and his wife agreed to act as her sponsors.[4]

---

[4]     The prosecution also called attorney Arnoldo Casillas as a witness. In testifying, Stevie stated that she was unaware that a civil lawsuit against appellant had been filed on her behalf. Casillas testified that Stevie had authorized him to file a civil lawsuit against appellant only after the criminal action against him was completed, and that he initiated the civil lawsuit without her knowledge.

B. *Defense Evidence*

Appellant, who testified on his own behalf, denied any misconduct regarding Stevie. He stated that after he married Stevie's mother and sponsored her for citizenship, she asked him to arrange for Stevie to live with them. When Stevie arrived, she disregarded his authority, used profane language, and performed few household chores. She also dressed like a boy, and viewed pornography on her laptop.

According to appellant, he became concerned whether he should take responsibility for Stevie's conduct by sponsoring her for a green card. After Stevie returned from her visit to China, he told her that he would not "renew [her] visa." Regarding the conversation that Stevie recorded, appellant denied that he made any remarks referring to an event during which he touched her. At trial, appellant asserted that no such remarks were audible on the recording, and that the recording had been "doctored." Appellant also maintained that during the conversation, he intended only to encourage Stevie to learn about her sexuality.

Appellant further testified that after the conversation occurred, Stevie asked appellant to meet her at a shopping mall. There, Officer Janguard told appellant to "shut up and listen" to Stevie. Stevie then played her recording of the conversation for appellant, but the recording was inaudible. Later, appellant wrote a letter informing Stevie that he would assist her in obtaining a new visa only if she stopped her accusations against him. At trial, appellant maintained that Stevie's accusations were baseless, and that she had been engaged in "extortion."

Thomas Guzman-Sanchez, an expert in audio analysis, opined that Stevie's audio recording had been edited. According to Guzman-Sanchez, the four-minute recording disclosed a single edit at approximately the mid-point of the recording.

Yi Fan Shang, who attended high school with Stevie, testified that they shared secrets while they were classmates. During that time, Stevie told her that

7

she was a lesbian.  Stevie's only complaints against appellant were that he verbally abused her and touched her breasts.  In addition, on one occasion, Stevie asked her to pick her up from her house.  They went to a park, where Stevie told her that appellant had tried to touch her.  Not until 2011 did Stevie suggest that appellant had sexually assaulted her.

Gloria Kalatzis, a counselor at Stevie's high school, testified that Stevie told her only that appellant verbally abused her.  She provided information regarding shelters to Stevie, who responded that she was not interested in living in a shelter.[5]

## DISCUSSION

Appellant contends the trial court erred in admitting the audio recording of his conversation with Stevie, denying his request for a continuance, and limiting his expert's testimony.  For the reasons discussed below, we disagree.

### A.  *Admission of Audio Recording*

Appellant contends the trial court contravened section 632 in admitting the audio recording of his conversation with Stevie.  That statute is a provision of the Invasion of Privacy Act (§ 630 et seq.), enacted in 1967.  (Stats. 1967, ch. 1509, p. 3584, §1.)  The Invasion of Privacy Act regulates wiretapping and electronic eavesdropping (*People v. Chavez* (1996) 44 Cal.App.4th 1144, 1148), with the aim of limiting "intentional, as opposed to inadvertent, overhearing or intercepting of communications."  (*People v. Buchanan* (1972) 26 Cal.App.3d 274, 287.)

Generally, section 632 "prohibits eavesdropping or intentionally recording a

---

[5]    In addition to these witnesses, Kenneth and Tracy Algire, appellant's children, testified that while Stevie lived with them, she wore boyish clothes, had girlfriends, and viewed lesbian pornography on her laptop.

confidential communication without the consent of all parties to the communication. [Citation.]"[6] (*Coulter v. Bank of America* (1994) 28 Cal.App.4th 923, 928; § 632, subd. (a).) Absent specified exceptions, the statute bars the admission of any such recorded confidential communications in judicial proceedings. (§§ 632, subd. (d), 633, 633.1, 633.5, 633.6, 633.8.) Pertinent here is the exception stated in section 633.5, which provides that nothing in section 632 "prohibits one party to a confidential communication from recording the communication for the purpose of obtaining evidence reasonably believed to relate to the commission by another party to the communication of . . . any felony involving violence against the person," or "renders any evidence so obtained inadmissible in a prosecution for . . . any felony involving violence against the person . . . ."

Appellant maintains that the trial court erred in admitting Stevie's audio recording under the exception described above. Regarding this contention, the record discloses that during the preliminary hearing, Stevie testified that she recorded her conversation with appellant solely to help her learn English, and not to support her claim that appellant had engaged in criminal conduct. Before trial, appellant objected to the admission of Stevie's audio recording on the basis of section 632. In response, the prosecutor argued that the recording fell within the exception stated in section 633.5, and alternatively, that Proposition 8 had abrogated the statutory rule requiring the exclusion of such evidence. The trial

---

[6] Subdivision (c) of section 632 provides: "The term 'confidential communication' includes any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, executive or administrative proceeding open to the public, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded."

court concluded that the recording was admissible under section 633.5. Later, during the trial, Stevie again testified that she recorded the conversation to "help [her] learn English."

It is unnecessary for us to determine the propriety of the court's ruling under section 633.5, as the recording was admissible on the alternative ground offered by the prosecutor. On appeal, we will affirm the admission of the recording on any theory properly established by the record. (*People v. Mason* (1991) 52 Cal.3d 909, 944.) As explained below, Proposition 8 abrogated the exclusionary rule upon which appellant relies.

"[I]n 1982, the California voters passed Proposition 8. Proposition 8 enacted Article I, section 28 of the California Constitution, which provides in relevant part: "Right to Truth-in-Evidence. Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings . . . . " (Cal. Const., art. I, § 28, subd. (f), par. (2).) (*People v. Lazlo* (2012) 206 Cal.App.4th 1063, 1069.) The "Truth-in-Evidence" provision in subdivision (f), paragraph (2), of article I, section 28 of the California Constitution (section 28(f)(2)) "was intended to permit exclusion of relevant, but unlawfully obtained evidence, only if exclusion is required by the United States Constitution . . . ." (*In re Lance W.* (1985) 37 Cal.3d 873, 890 (*Lance W.*).) Section 28(f)(2) is applicable not only to judicially created rules of exclusion (*In re Demetrius A.* (1989) 208 Cal.App.3d 1245, 1247), but also to statutory evidentiary restrictions (*Lance W.*, *supra*, 37 Cal.3d at p. 893; *People v. Ratekin* (1989) 212 Cal.App.3d 1165, 1169 (*Ratekin*)).[7]

---

[7]    When *Lance W.* and *Ratekin* were decided, the "Right to Truth-in-Evidence" provision enacted by Proposition 8 was found in subdivision (d) of article I, section

*(Fn. continued on next page.)*

In *Ratekin*, the appellate court examined section 631, a provision of the Invasion of Privacy Act that closely resembles section 632. As originally enacted and in its present form, section 631 bars wiretapping without the consent of all parties to the communication, and states that evidence obtained in contravention of that prohibition is inadmissible in a judicial proceeding. (*Ratekin*, *supra*, 212 Cal.App.3d at p. 1169; § 631, subds. (a), (c).) The appellate court concluded that section 28(d) abrogated the exclusionary rule in section 631, noting that following Proposition 8, the Legislature had not reinstated that rule by a two-thirds vote of the membership in each house of the Legislature. (*Ratekin*, *supra*, at p. 1169.)

We confront an issue not presented in *Ratekin*. As respondent observes, in 1985, the Legislature enacted the Cellular Radio Telephone Privacy Act of 1985 (1985 Act). (Stats 1985, ch. 909, p. 2900.) The focal element of that legislation is section 632.5, which prohibits the interception of cellular telephone communications, absent specified circumstances.[8] (Stats 1985, ch. 909, pp. 2900-

---

28 of the California Constitution.

[8]     Section 632.5 provides: "(a) Every person who, maliciously and without the consent of all parties to the communication, intercepts, receives, or assists in intercepting or receiving a communication transmitted between cellular radio telephones or between any cellular radio telephone and a landline telephone shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500), by imprisonment in the county jail not exceeding one year or in the state prison, or by both that fine and imprisonment. If the person has been previously convicted of a violation of this section or Section 631, 632, 632.6, 632.7, or 636, the person shall be punished by a fine not exceeding ten thousand dollars ($10,000), by imprisonment in the county jail not exceeding one year or in the state prison, or by both that fine and imprisonment. [¶] (b) In the following instances, this section shall not apply: [¶] (1) To any public utility engaged in the business of providing communications services and facilities, or to the officers, employees, or agents thereof, where the acts otherwise prohibited are for the purpose of construction, maintenance, conduct, or operation of the services and facilities of the public utility. [¶] (2) To the use of any instrument, equipment, facility, or service furnished and used pursuant to the tariffs of the public utility. [¶] (3) To any telephonic communication system used for communication exclusively within a state, county, city and county, or *(Fn. continued on next page.)*

11

2904.) In enacting the statute, the Legislature also amended section 632 and related statutes to reflect the addition of section 632.5, without making substantial changes to the wording of the exclusionary rule set forth in subdivision (d) of section 632. At least two-thirds of the members of each house of the Legislature voted in favor of the 1985 Act.[9] The question thus presented is whether its enactment revived the exclusionary rule in subdivision (d) of section 632, abrogated by section 28(f)(2).

We find dispositive guidance on this issue from *Lance W.* There, the Supreme Court addressed subdivision (a) of section 1538.5, which -- as originally enacted and in its present form – states, inter alia, that a criminal defendant may seek suppression of evidence obtained through a search or seizure in violation of "state constitutional standards." (*Lance W.*, *supra*, 37 Cal.3d at p. 893; § 1538.5, subd. (a)(1)(B)(v).) As the court noted, after section 28(d) abrogated that provision of section 1538.5, the Legislature amended section 1538.5 twice, once by a two-thirds majority in both houses of the Legislature. (*Lance W.*, *supra*, at pp. 893-896.) Because the California Constitution provides that "[a] section of a statute may not be amended unless the section is re-enacted as amended" (Cal. Const., art. IV, § 9), and the amendments did not materially modify the pertinent provision of section 1538.5, the court examined whether the amendments revived that provision. (*Lance W.*, *supra*, 37 Cal.3d at pp. 893-896.)

city correctional facility. [¶] (c) As used in this section and Section 635, 'cellular radio telephone' means a wireless telephone authorized by the Federal Communications Commission to operate in the frequency bandwidth reserved for cellular radio telephones."

[9]    The legislative basis of the 1985 Act was Senate Bill No. 1431. (Sen. Final History, (1985-1986 Reg. Sess.) p. 965.) Regarding that bill, the Assembly vote was 64 ayes and 7 noes, and the Senate vote was 27 ayes and 4 noes. (*Ibid.*) As the Assembly has 80 members and the Senate has 40 members (Cal. Const., art. IV, § 2, subd. (a)), the affirmative votes constituted at least two-thirds of each house's membership.

12

The court determined that the amendments did not reinstate the abrogated provision, as there was no evidence of a legislative intent to do so. (*Lance W.*, *supra*, 37 Cal.3d at pp. 893-896.) As the court observed, neither the legislative history of the amendments nor the Legislature's declarations regarding them manifested any intent to nullify the operation of Proposition 8. (*Ibid*.) Indeed, when the Legislature amended section 1538.5 by a two-thirds majority in both houses, the amendment was an element of a group of amendments that the legislative history described as a "noncontroversial 'clean up'"; moreover, those "'clean up'" amendments were unanimously adopted by the Legislature. (*Lance W.*, *supra*, at p. 894.) The court stated: "We cannot assume that the Legislature understood or intended that such far-reaching consequences -- virtually a legislative repeal of the 'Truth-in-Evidence' section of Proposition 8 -- would follow an amendment so casually proposed and adopted without opposition." (*Ibid*.)

Based on our Supreme Court's analysis in *Lance W.*, we reach a similar conclusion regarding the abrogated exclusionary rule set forth in subdivision (d) of section 632. Accompanying the 1985 Act was a declaration of legislative intent that focused exclusively on the need to protect private cellular phone communication. (Stats. 1985, ch. 909, § 2, pp. 2900-2901.) The declaration states: "[T]his act is intended to provide recourse to those persons whose private cellular radio telephone communications have been maliciously invaded by persons not intended to receive such communications." (*Ibid*.) The narrow scope of the Legislature's intent is further confirmed by section 632.5 itself, the primary element of the 1985 Act. That provision discloses no intent to nullify the operation of Proposition 8, as it contains no provision akin to subdivision (d) of section 632 establishing an exclusionary rule. Appellant has directed us to no portion of the legislative history -- and we have found none -- evincing the Legislature's intent to

13

annul the effects of section 28(f)(2).  Because there is no suggestion that the Legislature's intent in enacting the 1985 Act was to revive the abrogated exclusionary rule contained in subdivision (d) of section 632, we conclude that legislation did not do so.[10]  Accordingly, the audio recording of Stevie and appellant's conversation could be excluded only under the federal exclusionary rule applicable to evidence seized in violation of the Fourth Amendment.  (*Lance W., supra,* 37 Cal. 3d at p. 896.)

Thus, the remaining question is whether the United States Constitution required exclusion of the audio recording.  (*Lance W.*, *supra*, 37 Cal.3d at p. 890.)  As Stevie did not record the conversation while acting as a government officer or agent, the recording does not implicate appellant's interests under the Fourth Amendment of the United States Constitution.  (*Jones v. Kmart Corp.* (1988) 17 Cal.4th 329, 333.)  Furthermore, under federal statutory law, recordings of conversations between private individuals made with the consent of only one party to the conversation are ordinarily admissible in judicial proceedings.  (*Zhou v. Pittsburg State University* (D. Kan. 2003) 252 F.Supp.2d 1194, 1203-1204; 18 U.S.C. § 2511(2)(d).)  Accordingly, we conclude that the admission of the audio recording did not offend the United States Constitution.  (See *Ratekin*, *supra*, 212 Cal.App.3d at p. 1169.)  In sum, the audio recording was properly admitted.

---

**10**     Appellant maintains that the exclusionary rule in section 632 remains effective notwithstanding section 28(f)(2).  His reliance on *People v. Parra* (1985) 165 Cal.App.3d 874 (*Parra*), *People v. Montgomery* (1976) 61 Cal.App.3d 718, *People v. Strohl* (1976) 57 Cal.App.3d 347, and *People v. Ayers* (1975) 51 Cal.App.3d 370, disapproved on another ground in *People v. Collie* (1981) 30 Cal.3d 43, 52-53, is misplaced.  Three of the four cases pre-date the passage of Proposition 8 in 1982.  In *Parra*, the appellate court did not address any contention predicated on Proposition 8, and found the pertinent evidence admissible under section 633.5.  (*Parra*, *supra*, 165 Cal.App.3d at pp. 878-881.)

14

B. *Remaining Contentions*

Appellant asserts two contentions arising from the prosecution's presentation of a transcript of the recorded conversation to the jury. He maintains that the trial court erred in denying a continuance to permit his expert to evaluate the transcript, and in limiting his expert's testimony regarding what was said during the recorded conversation.

### 1. *Underlying Proceedings*

In January 2012, Bob Bernstein first appeared in the underlying proceedings as appellant's counsel. Soon afterward, he obtained a copy of the recorded conversation, which he submitted to a court reporting service for transcription.

In March 2012, at the preliminary hearing, Stevie testified that she began recording her conversation with appellant when he used the word "orgasm." She further stated that during the conversation, he said that when he "touch[ed her] the last time," she was not "wet," which was unusual for girls her age. In addition, according to Stevie, appellant suggested that he needed to teach her "what's going on."

On Tuesday, July 19, 2012, immediately before the selection of the jury, the prosecutor provided the trial court and Bernstein with a transcript of the recorded conversation, which reflected the remarks that Stevie had described during the preliminary hearing. In response, Bernstein filed a motion for a continuance of the trial.[11]

---

[11]     The motion for a continuance is not included in the record on appeal.

On July 18, 2012, the trial court conducted a hearing on the motion. Bernstein stated that he requested a continuance until Monday, July 23, 2012, to allow a forensic tape expert to analyze the recording and determine whether it had been modified or edited. He argued that before he saw the transcript of the recording, he did not know the prosecution intended to claim that the inculpatory remarks Stevie ascribed to appellant were audible on the recording. He maintained that when he had the recording transcribed, the court reporting service identified the pertinent portions of the recording as inaudible. In response, the prosecutor asserted that the request for a continuance was untimely, arguing that Bernstein had adequate notice of the prosecution's view regarding the contents of the recording.

In denying the request, the trial court stated: "It is the tape and not the transcript that governs[.] . . . The exchange of the transcript is inconsequential . . . . I will be giving an instruction . . . before the tape is played that[] if [the jurors] see a discrepancy between what they hear and what they read[,] . . . what they read does not govern. It's what they hear that governs[.] [T]hat's the evidence."

On July 18, 2012, following the selection of the jury, the prosecution began its case-in-chief. When the audio recording was played for the jury during Stevie's testimony, the court instructed the jury in accordance with its ruling.**12**

---

**12**     The court informed the jury: "The transcript is not the evidence. The transcript is only to be used as an aid to let you follow along with what you hear. If you hear a discrepancy between what is in the tape and what you read in the transcript, it is what is in the tape that governs, that is the evidence. At the conclusion of the playing of the [tape], we will take the transcripts away from you. You will not, repeat, will not have the transcript in the jury room during deliberations." Although the court later admitted the transcript into evidence, it did not permit the jury to examine the transcript during the jury's deliberations.

16

On Friday, July 20, 2012, appellant began his defense by presenting testimony from several percipient witnesses, including himself. During the afternoon session, the trial court conducted a hearing on the proposed testimony from Thomas Guzman-Sanchez, appellant's expert in audio analysis. Bernstein stated that in order to rebut the prosecution's transcript, appellant hired Guzman-Sanchez to examine the recording for edits, and provide an alternative interpretation of what was said during the conversation. In reply, the prosecutor maintained that Guzman-Sanchez's evidence should be excluded because she first received Guzman-Sanchez's report that morning. Additionally, she argued that if the court allowed Guzman-Sanchez to testify, he should not be permitted to opine as an expert regarding what was said during the conversation.

The trial court permitted Guzman-Sanchez to testify, subject to several limitations. The court ruled that Guzman-Sanchez could play an enhanced version of the recording he had prepared and opine whether he heard the disputed remarks reflected in the prosecutor's transcript. However, the court excluded a transcript that Guzman-Sanchez had prepared, and barred him from offering an opinion regarding what appellant had said, in lieu of the remarks reflected in the prosecutor's transcript. Regarding this ruling, the court stated: "[T]he expert cannot tell me what the words are . . . . The tape is the tape. That is evidence."

In addition, the trial court permitted Guzman-Sanchez to testify whether he detected edits in the recording, but prohibited him from demonstrating how the edits may have been made. The court also ruled that Guzman-Sanchez's testimony was potentially subject to a "late discovery" instruction.

No proceedings occurred on Monday, July 23, 2012. The following day, appellant called Guzman-Sanchez, who testified that he was a video forensics investigator who also performed audio analysis. He stated that he had subjected the audio recording provided by the prosecutor to sound wave analysis. According

to Guzman-Sanchez, that analysis disclosed irregularities in sound patterns characteristic of an edit. The defense did not play the enhanced recording Guzman-Sanchez had prepared, and he was not asked whether he heard in the recording the disputed remarks reflected in the prosecution's transcript.

### 2. *Request for Continuance*

Appellant contends the trial court erred in denying his request for a continuance to permit an analysis of the audio recording. We disagree. Generally, a continuance may be granted only on a showing of good cause. (§ 1050, subd. (e).) To obtain a continuance, defendants must show "they exercised due diligence and all reasonable efforts to prepare for trial . . . ." (*People v. Grant* (1988) 45 Cal.3d 829, 844.) A court has broad discretion to deny a motion for a continuance. (*Ibid*.)

We find no abuse of discretion here. Although appellant's counsel received the transcript shortly before trial, he had long been aware that the prosecution planned to rely on the disputed remarks reflected in the transcript, as Stevie testified regarding their existence during the preliminary hearing. Furthermore, because the prosecution disclosed the audio recording well before trial, appellant's counsel had ample opportunity to submit the recording to expert analysis to determine the extent to which it supported Stevie's testimony. The trial court thus did not err in denying the continuance. (See *People v. Danielson* (1992) 3 Cal.4th 691, 705, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1068, fn. 13 [court properly denied defendant's request for three-day continuance during jury selection to permit expert to evaluate jurors' questionnaires when defense counsel failed to deliver them to expert in timely manner].)

Additionally, even if appellant had established an abuse of discretion, the

record discloses no prejudice to appellant from the denial of the continuance. (*People v. Jackson* (2009) 45 Cal.4th 662, 678 [denial of continuance does not support reversal of the judgment absent a showing of prejudice].) Here, appellant sought a continuance of "at least three days" to Monday, July 23, 2012, to permit an expert to examine the audio recording for edits, enhance it, and develop an opinion regarding what was said during the conversation. Notwithstanding the denial of the continuance, Guzman-Sanchez performed those tasks by Friday, July 20, 2012, well before he testified on Tuesday, July 24, 2012.

Nor did the denial of the continuance operate to curtail Guzman-Sanchez's testimony regarding the matters for which appellant sought a continuance. The trial court permitted Guzman-Sanchez to testify regarding possible tampering with the recording. The court also made clear that it would permit the enhanced recording Guzman-Sanchez prepared to be played, but the defense declined to do so. Furthermore, although the court excluded Guzman-Sanchez's proposed transcript and barred him from opining regarding what was said during the conversation, for reasons explained below, those rulings were proper (see pt. B.3., *post*).[13] In sum, the trial court did not err in denying the requested continuance.

### 3. *Limitation on Expert Testimony*

Appellant maintains the trial court erred in precluding Guzman-Sanchez from presenting his interpretation of the audio recording. The crux of appellant's argument is that the court unfairly permitted the prosecution to present its belatedly disclosed transcript to the jury, while barring him from offering Guzman-

---

[13]  We recognize that the court also barred Guzman-Sanchez from demonstrating to the jury how the tampering might have been performed. However, as appellant does not challenge that ruling on appeal, he has forfeited any contention of error regarding it.

Sanchez's opinion regarding what was said during the recorded conversation. For the reasons discussed below, we reject appellant's contention.

At the outset, we observe that our inquiry has a limited scope, as appellant forfeited material aspects of his contention. Generally, a trial court may employ at least two procedures regarding a transcript of an audio recording, depending upon the purpose of the transcript. If the transcript is submitted as evidence to the jury, the court ordinarily should inquire into the accuracy of the transcript by examining the circumstances of its preparation, listening to the audio recording, and permitting the parties to challenge the transcript. (*People v. Polk* (1996) 47 Cal.App.4th 944, 953-956.) Alternatively, if the transcript is provided only as a guide for the jury, the court may instruct the jury regarding the transcript's limited purpose, including that the transcript is not to be viewed as evidence. (*People v. Brown* (1990) 225 Cal.App.3d 585, 597-599.)

Although appellant maintains on appeal that the prosecution's transcript was untimely, that it was "inflammatory," and that its accuracy was "impossible to verify," he neither challenged the procedure adopted by the trial court nor contested the presentation of the transcript on the ground that it was belatedly disclosed to him. Rather, the remedy he sought was a continuance in order to have an expert examine and enhance the audio recording. Accordingly, he has forfeited any contention regarding the presentation of the prosecution's transcript to the jury. (*People v. Houston* (2012) 54 Cal.4th 1186, 1213-1214.)

The sole issue properly before us is whether the trial court improperly barred Guzman-Sanchez from opining as to what was said during the conversation. We conclude that the court's ruling was proper on the ground advocated by the prosecutor and apparently credited by the court, namely, that Guzman-Sanchez's interpretation of what was said during the conversation was not a proper subject of his expert testimony.

20

In contrast with the prosecution's transcript, which was not submitted as evidence to the jury, appellant sought to admit Guzman-Sanchez's interpretation of the recorded conversation into evidence. That interpretation -- whether offered in the form of a transcript or in the form of opinion testimony -- was founded exclusively on Guzman-Sanchez's purported expertise, as he was not a percipient witness to the underlying conversation. Generally, "'[o]pinion testimony may be admitted in circumstances where it will assist the jury to understand the evidence or a concept beyond common experience. Thus, expert opinion is admissible if it is "[r]elated to a subject that is sufficiently beyond common experience [and] would assist the trier of fact." (Evid. Code, § 801, subd. (a).)'" (*People v. Singleton* (2010) 182 Cal.App.4th 1, 20.) "Whether an expert should be permitted to opine on a particular subject is consigned to the trial court's discretion." (*People v. Sandoval* (2008) 164 Cal.App.4th 994, 1001.)

"'Expert opinion is not admissible if it consists of inferences and conclusions which can be drawn as easily and intelligently by the trier of fact as by the witness.' [Citation.]" (*People v. Torres* (1995) 33 Cal.App.4th 37, 45, quoting Evid. Code § 801, subd. (a).) Similarly, as explained in *People v. King* (1968) 266 Cal.App.2d 437, 445, an expert opinion is not admissible if it concerns a subject outside the expert's field of expertise. There, the trial court permitted an expert who specialized in the analysis of recorded speech to opine regarding the identity of a speaker in a recorded conversation. (*Id*. at pp. 441-457.) In reversing the judgment, the appellate court concluded that there was no showing that the expert's qualifications as an audio analyst established his expertise in recognizing speakers. (*Id*. at p. 457.)

We confront a situation similar to that presented in *King*, as there is no evidence that Guzman-Sanchez had any expertise superior to the abilities of the jury regarding the recognition of words on audio recordings. Guzman-Sanchez's

21

only demonstrated expertise concerned the enhancement of audio recordings to make conversations on them more audible, and the analysis of sound patterns on recordings, for purposes of locating edits and other anomalies.

According to Guzman-Sanchez, as a video forensics investigator, his "background, training, [and] experience" lay in "[v]ideo production," in the "entertainment industry," that is, "creating . . . any type of visual presentation in the digital or analogue format." In the entertainment industry, he worked as an editor. After becoming a video forensics investigator, he had performed work in criminal actions involving "[v]ideo enhancing, stabilization, [and] time/date verification." However, Guzman-Sanchez did not suggest that he had any special experience or training in the recognition of words spoken in a problematic audio recording, or that he had ever prepared a transcript from such a recording. Accordingly, the trial court did not abuse its discretion in ruling that as an expert, Guzman-Sanchez was not qualified to "tell [anyone] what the words are." In sum, the trial court did not err in precluding Guzman-Sanchez from testifying regarding his interpretation of the audio recording.

## DISPOSITION

The judgment is affirmed.

## CERTIFIED FOR PARTIAL PUBLICATION.

MANELLA, J.

We concur:

EPSTEIN, P. J.

WILLHITE, J.

22